# 25-776-PR

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

RICARDO JIMENEZ,

*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, WENDELL STRADFORD, CHRISTOPHER HORN, BRONX COUNTY DISTRICT ATTORNEYS OFFICE, KAREN SERRANO-PAGLIA, AS ADMINISTRATOR OF THE ESTATE OF MICHAEL SERRANO,

*Defendants-Appellees,*

*and*

MICHAEL SERRANO,

*Defendant.*

*On Appeal from the United States District Court for the Southern District of New York*

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT (REDACTED)**

Joshua D. Kelner
KELNER & KELNER, ESQS.
*Attorneys for Plaintiff-Appellant*
7 World Trade Center
250 Greenwich Street, Suite 2700
New York, New York 10007
212-425-0700

PHP (212) 719-0990 appeals@phpny.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................ 1

JURISDICTION ........................................................ 8

ISSUES PRESENTED ........................................................ 8

STATEMENT OF THE CASE ........................................................ 9

A. The underlying investigation and pretrial withholding of evidence........................................................ 9

B. The trial ........................................................ 20

C. The post-trial proceedings ........................................................ 24

D. Procedural history ........................................................ 31

SUMMARY OF ARGUMENT ........................................................ 33

I. Plaintiff Stated A Valid Claim For Malicious Prosecution Against Serrano, Horn, And Stradford, All Of Whom Were Alleged In The Complaint To Have Engaged In Improper Conduct To Coerce Or Induce False Statements From Witnesses To Implicate Him .............. 38

A. Plaintiff stated valid malicious prosecution claims against Serrano and Horn ........................................................ 40

i. Serrano and Horn's misconduct in taking the first false statement from Blaylock was a substantial cause of plaintiff's damages ........................................................ 40

ii. While plaintiff should not have been required to offer substantive proof of his allegations at the pleading stage, there is ample evidence to establish the plausibility of his allegations concerning Serrano and Horn ........................... 44

iii. The motion court also improperly found that, because Blaylock did not recant at trial, his identification of plaintiff must have been correct, which was plainly premature at the pleading stage ........................................ 51

B. Plaintiff stated a valid malicious prosecution claim against Stradford ........................................................................................ 54

II. Plaintiff Stated Colorable Fair Trial Claims Against All Of The Officer Defendants, As Their Fabrication Of Evidence Caused Him To Be Deprived Of His Liberty ........................................................... 56

A. Plaintiff stated valid fair trial claims against Serrano and Horn ............................................................................................. 56

B. Plaintiff stated a valid fair trial claim against Stradford ...... 58

i. Plaintiff pleaded plausible allegations of misconduct by Stradford relating to Blaylock ............................................ 59

ii. Plaintiff pleaded plausible allegations of misconduct by Stradford relating to O'Brien .............................................. 60

III. Plaintiff Stated Colorable Claims For Failures To Intervene By Serrano And Horn ..................................................................... 63

VI. Plaintiff Pleaded A Colorable *Monell* Claim Based On The Bronx County District Attorney's Office's Longstanding Failure To Discipline Prosecutors For Committing Misconduct In Pursuit Of Convictions ........................................................................ 66

A. The motion court erroneously found that plaintiff was legally required to make a showing as to Mattaway's intent in violating *Brady* ........ 68
B. The motion court erroneously found that Mattaway's violation was unintentional ........ 70

CONCLUSION ........ 73

# TABLE OF AUTHORITIES

*Amnesty America v. Town of West Hartford*
361 F.3d 113 (2d. Cir. 2004) ........................................................................ 67

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ..................................................................... 34, 37, 52

*Bailey v. City of New York*
79 F.Supp.3d 424 (E.D.N.Y. 2015) ..................................................... 41, 67

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ........................................................................... 34

*Bellamy v. City of New York*
914 F.3d 727 (2d Cir. 2019) ............................................................. 67, 68

*Bermudez v. City of New York*
790 F.3d 368 (2d Cir. 2015) ......................................................... 43, 53, 55

*Blake v. Race*
487 F. Supp. 2d 187 (E.D.N.Y. 2007) .................................................... 43

*Brady v. Maryland*
373 U.S. 83 (1963) ..................................................................... *passim*

*Breton v. City of New York*
404 F. Supp. 3d 799 (S.D.N.Y. 2019) .................................................... 64

*Brisco v. Ercole*
565 F.3d 80 (2d Cir. 2009) ................................................................... 46

*Buari v. City of New York*
530 F. Supp. 3d 356 (S.D.N.Y. 2021) ........................................... *passim*

*Demosthene v. City of New York*,
2019 WL 181305 (E.D.N.Y. 2019) ......................................................... 39

*Doe v. Columbia Univ.*
831 F.3d 46 (2d Cir. 2016) ........................................................ *passim*

*Dukes v. City of Albany*
289 F.Supp.3d 387 (N.D.N.Y. 2018) ..................................................... 71

*Fappiano v. City of New York*
640 Fed. App'x 115 (2d Cir. 2016) ........................................................ 69

*Fink v. Time Warner Cable*
714 F.3d 739 (2d Cir. 2013) ..................................................... 34, 47, 61

*Fuentes v. T. Griffin*
829 F.3d 233 (2d Cir. 2016) ................................................................ 72

*Garnett v. Undercover Officer C0039*
838 F.3d 265 (2d Cir. 2016) ................................................................ 56

*Gersbacher v. City of New York*
134 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................... 64

*Goldman v. Belden*
754 F.2d 1059 (2d Cir. 1985) .............................................................. 34

*Graham v. City of New York*
2018 WL 1157818 (E.D.N.Y. 2018) ...................................................... 39

*Hain v. Jamison*
28 N.Y.3d 524 (2016) ........................................................................... 43

*Harrington v. Richter*
562 U.S. 86 (2011) ............................................................................... 72

*Haskins v. City of New York*
2017 WL 3669612 (E.D.N.Y. 2017) ...................................................... 56

*Higazy v. Templeton*
505 F.3d 161 (2d Cir. 2007) .......................................................... 43

*Hincapie v. City of New York*
2022 WL 2870411 (S.D.N.Y. 2022) .................................................. 41

*Isaac v. City of New York*
2018 WL 5020173 (E.D.N.Y. 2018) .................................................. 35

*Jean-Laurent v. Wilkinson*
540 F. Supp. 2d 501 (S.D.N.Y. 2008) ............................................. 63

*Johnson v. United States*
759 F Supp.3d 425 (S.D.N.Y. 2024) ................................................ 42

*Jones v. City of Chicago*
856 F.2d 985 (7th Cir.1988) .......................................................... 43

*Kaplan v. Lebanese Can. Bank*
*SAL*, 999 F.3d 842 (2d Cir. 2021) ...................................................... 9

*Manganiello v. City of New York*
612 F.3d 149 (2d Cir. 2010) .......................................................... 41

*McLennon v. New York City*
2015 WL 1475819 (E.D.N.Y 2015) ................................................... 35

*Monell v. Department of Social Services of City of New York*
436 U.S. 658 (1978) ............................................................... *passim*

*Mysholowsky v. People*
535 F.2d 194 (2d Cir.1976) ........................................................... 46

*O'Neill v. Krzeminski*
839 F.2d 9 (2d Cir. 1988) .............................................................. 63

*Oakley v. Dolan*
980 F.3d 279, 284 (2d Cir 2020) ........................................... *passim*

*People v. Jimenez*
2018 WL 5726958 (1st Dept. 2018) ........................................... 25

*Pizarro v. City of New York*
2015 WL 5719678 (E.D.N.Y. 2015) ........................................... 35

*Ricciuti v. N.Y. City Transit Auth.*
124 F.3d 123 (2d Cir. 1997) ........................................... 38, 64

*Roe v. City of Waterbury*
542 F.3d 31 (2d. Cir. 2008) ........................................... 66

*Rohman v. NYCTA*
215 F.3d 208 (2d. Cir 2000) ........................................... 41

*Savino v. City of New York*
331 F.3d 63 (2d Cir. 2003) ........................................... 38

*Simmons v. United States*
390 U.S. 377 (1968) ........................................... 60

*Sullivan v. City of New York*
2018 WL 3368706 (S.D.N.Y. 2018) ........................................... 64

*Townes v. City of New York*
176 F.3d 138 (2d Cir. 1999) ........................................... 43

*United States v. Bermudez*
2024 WL 81843 (S.D.N.Y. 2024) ........................................... 47

*United States v. Jimenez (William)*
2020 WL 7231062 (S.D.N.Y. 2020) ........................................... 47

*United States v. Wade*
388 U.S. 218 (1967) .......................................................................... 49

*Walker v. City of New York*
974 F.2d 293 (2d Cir. 1992) ............................................................ 67, 69

*Walston v. City of New York*
289 F. Supp. 3d 398 (E.D.N.Y. 2018) .................................................. 47

*Wiggins v. Greiner*
132 Fed. App'x 861 (2d Cir. 2005) ....................................................... 46

*Zahrey v. Coffey*
221 F.3d 342 (2d Cir. 2000) ................................................................ 43

## PRELIMINARY STATEMENT

This case arises from the wrongful conviction of Ricardo Jimenez for a murder he did not commit.

In 1989, Sean Worrell was shot and killed in a crowded movie theater, where he was attending a showing of "Batman," following an argument at the concession stand.[1] The shooting was witnessed by a number of bystanders, who gave generally consistent descriptions of the perpetrator as a Black man who spoke with a Jamaican accent, was wearing gold chains, and had distinctive blond streaks dyed into his hair. One of the witnesses who described the shooter in these terms was Esco Blaylock, a 15-year-old who worked at the concession stand. He told the two assigned detectives, Michael Serrano and Christopher Horn, that he knew the shooter, whose name was Leon. He also referred the detectives to another teenager named Sharon Ramroop, whom he said had dated Leon. Ramroop described Leon much the same way as everyone else: she said he was of "Jamaican/Indian heritage" and was a flashy dresser. The detectives tried and failed to locate Leon. They then, having hit a dead end, brought Blaylock and Ramroop to the

[1] The facts are taken from the Complaint and documents in the Appendix.

station and, according to their opaquely worded official reports, "confronted" the two teens.

The teens, who both went into the stationhouse "confrontation" identifying a person named Leon whom they knew well, emerged from it claiming the perpetrator was Ricardo Jimenez – a different person altogether, who did not match the description any of the bystanders had given and, suffice it to say, was not named Leon.

Jimenez was arrested but Blaylock recanted and the case was dropped. Serrano and Horn did not even *try* to see if other witnesses from the theater would identify plaintiff, because they knew no one else do so.

The case lay dormant until the early 2000s, when Det. Wendell Stradford assumed responsibility. Stradford initiated contact with Blaylock and, through improper means, induced him to reprise his prior identification of plaintiff. Stradford also contacted Andrew O'Brien, a former gang member who was serving a lengthy federal prison sentence following a plea deal in the Eastern District of Virginia.

When O'Brien first entered his plea deal with federal authorities in 1997, he sat for four days of interviews with the FBI, during which he

discussed his knowledge of a wide array of crimes. The FBI created a detailed 32-page memorandum documenting what O'Brien said during the interviews. During one of the sessions, agents showed him a photograph of Worrell, who had been associated with members of the same gang. O'Brien said that he knew Worrell had been killed in a theater, but did not claim any knowledge of who had done it. After entering his plea deal, O'Brien cooperated with the U.S. Attorney's Office and testified at the trial of one of the gang's leaders. The AUSA responsible for his case moved for a sentencing reduction on O'Brien's behalf. The motion was granted and O'Brien received a five-year sentence reduction. O'Brien then began to write letters to the judge assigned to his case begging for a further reduction.

Stradford reached out to O'Brien and met with him in prison. O'Brien, who originally had professed no knowledge at all about the shooting, left his meeting with Stradford claiming that he was in the theater with Worrell and that Jimenez was the shooter. This identification came about due to improper, suggestive conduct by Stradford. Plaintiff was again arrested.

As trial approached, the assigned ADA on the case, Lisa Mattaway, had a number of conversations with O'Brien. She contacted the AUSA who had moved for O'Brien's first sentencing reduction and asked him for materials relating to O'Brien's past cooperation. He provided her with a number of documents, including the 1997 FBI memo showing he had no knowledge of the shooting, his plea agreement (which showed he could receive further reductions), and his letters begging for a further reduction. In his cover letter, the AUSA told Mattaway he was providing them "for your consideration as to whether they are discoverable" – which seems to have been a polite suggestion they might be *Brady* materials.

Mattaway did not produce any of the documents to the defense and then, at trial, elicited testimony contrary to the contents of the documents. O'Brien testified that he originally told FBI agents in 1996 that he was in the theater and could identify the shooter – which the unproduced memo showed was untrue. Stradford then bolstered this fiction by claiming that he originally contacted O'Brien after requesting from the DEA "files that might have been related to the homicide in question," strongly implying in response to Mattaway's questions that

O'Brien told the FBI he had knowledge of the crime. O'Brien also told the jury that he was testifying out of guilt, which the unproduced documents about his cooperation would have contradicted. Blaylock testified at trial, too. He identified Jimenez as the shooter, but admitted to differences between Jimenez and his original description of Leon. The jury deliberated for five days before rendering a guilty verdict.

Plaintiff lost nearly two decades of his life to incarceration before his petition for a writ of habeas corpus was granted by the Honorable J. Paul Oetken. In his decision, Judge Oetken found that Mattaway violated her *Brady* obligations by failing to produce the documents she received from the AUSA about O'Brien. He also found that Serrano and Horn engaged in a "highly suggestive" identification procedure with Blaylock; questioned O'Brien and Stradford's credibility about how and why they first met and whether O'Brien's identification of plaintiff was truthful; and found that the case was "weak" and beset by features "common in wrongful convictions."

After the charges against him were dismissed in state court, Jimenez brought this civil suit. In addition to various claims against

the individual officers, he also stated a *Monell* claim against the Bronx County District Attorney's Office ("BCDAO"), which for decades had failed to discipline prosecutors for *Brady* and other ethical violations. He alleged that Mattaway's *Brady* violations were a product of this culture.

Defendants filed a pre-Answer motion to dismiss pursuant to FRCP 12(b)(6). The District Court (Buchwald, J.) granted the motion, finding that plaintiff's claims of police misconduct, many of which tracked findings from Judge Oetken's opinion, were not even *plausible*. In its opinion, the District Court engaged in a sweeping consideration of the merits of the claim, resolving numerous credibility questions along the way. It waded deeply into the record of the criminal case, including the grand jury and trial transcripts, state court opinions, and police investigative documents. It found that the very same identification procedure with Blaylock that Judge Oetken found to be "highly suggestive" was proper as a matter of law; that the police had used "routine investigative techniques;" that Blaylock's identification of plaintiff at trial was credible because he had not recanted; and that Mattaway did not intend to violate *Brady*. The District Court even

questioned whether Mattaway violated *Brady* at all. The decision read very much like the resolution of a summary judgment motion, repeatedly making references to the purported lack of "proof" or "evidence in the record" for particular allegations in the Complaint. Its findings uniformly presumed the truth of the detectives' accounts in their official reports over the contrary allegations of the Complaint and put the burden on plaintiff to refute defendants' official reports with "proof" of misconduct.

The role of a court on an FRCP 12(b)(6) motion is "not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). In context of a motion to dismiss, it was neither necessary nor appropriate to resolve evidentiary questions or credibility issues. Plaintiff's detailed 35-page Complaint was more than sufficient and it is surely "plausible" that plaintiff can prove the factual points that formed the basis for Judge Oetken's habeas decision in his civil case.

For the reasons set forth more fully below, it is respectfully submitted that the Decision and Order of the District Court should be reversed.

## JURISDICTION

The District Court had jurisdiction over plaintiffs' claims pursuant 42 U.S.C. §1983 and supplemental jurisdiction over his state law claims. Appellate jurisdiction rests on 28 U.S.C. § 1291. The district court entered final judgment dismissing all claims on March 27, 2025. Plaintiff filed his notice of appeal on April 1, 2025.

## ISSUES PRESENTED

1. Whether the District Court erred in dismissing plaintiff's Complaint pursuant to FRCP 12(b)(6), in light of plaintiff's detailed, well-pleaded allegations of misconduct by the defendants.

## STATEMENT OF THE CASE[2]

### A. The underlying investigation and pretrial withholding of evidence

On July 3, 1989, Sean Worrell was killed in the Whitestone Movie Theater in Bronx, New York, where he was attending a showing of "Batman." (A76). While Worrell and his associates were waiting at the concession stand, they became embroiled in an argument with another man. The other man went outside and retrieved a gun, returned to the theater, and engaged in a shootout with Worrell and his associates, who also were carrying firearms in the theater. (A76). Worrell was shot and killed. (A78-79).

Numerous bystanders in the theater witnessed the shooting and described the shooter to the police. It emerged that the shooter was a

---

[2] The Appendix contains documents that were incorporated by reference into the Complaint. *See, e.g., Kaplan v. Lebanese Can. Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference"). Here, plaintiff's Complaint specifically incorporated by reference his submissions, including exhibits, to his habeas petition and reply. *See* A91, n.2 ("This Amended Complaint incorporates by reference as exhibits hereto the documents filed in Jimenez v. Graham, 11-cv-06468 (JPO) at Docket Nos. 37 and 56, including the annexed exhibits and subparts…."). The Appendix also incorporates correspondence between the Court and parties and documentary materials it requested for its consideration during the pendency of the motion, both of which were referenced in its decision.

Black man with distinctive bleached blond stripes died into his hair, who was wearing gold chains and spoke with a Jamaican accent. (A79, 108-11, 323-24, 328).

One of the bystanders who described the shooter in such a fashion was Esco Blaylock, a teenager who worked at the theater's concession stand. (A79-80). On the same day as the shooting, Blaylock spoke with Detectives Michael Serrano and Christopher Horn. (A79, 112-13). Blaylock described the shooter as a Black man named Leon with gold stripes in his hair, gold chains, and a gold tooth. (A79, 114). Blaylock said that he had known Leon for several years and provided specific details about him, including the kind of car he drove, his address, and his arrest history. (A114). He also said that Leon dated a young woman he knew named Sharon. (A79, 114).

On July 6, Serrano met Blaylock at the theater in "an attempt to further identify 'Leon.'" (A115). Blaylock provided Serrano with Sharon's full name, which was Sharon Ramroop. (A115). He told Serrano that he typically saw Sharon and Leon together in the vicinity of Watson and Boyton Avenues. Serrano canvassed the area Blaylock identified but could not locate Leon. (A115).

On July 10, Serrano interviewed Ramroop. (A80). She said that she, in fact, knew a man named Leon from her neighborhood. She described him much in the same way the bystanders had: a man of "Jamaican and Indian Extraction" who was a "flashy dresser." (A80, 116). The NYPD again tried and failed to locate Leon. (A80). Ricardo Jimenez never had gold stripes in his hair and otherwise failed to match the description provided by the witnesses. (A80).

On July 11, 1989, having reached an apparent dead end in their attempts to locate Leon, Serrano and Horn brought Blaylock and Ramroop, both of whom were teenagers, to the precinct without their parents or guardians. Serrano's DD-5 described the ensuing encounter opaquely:

> CONFRONTATION OF ESCO BLAYLOCK AND SHARON RAMROOP
>
> On July 11, 1989, in an effort to further identify "Leon", Esco and Sharon were confronted in this office. Esco and Sharon exchanged information relative to the description originally furnished by the various witnesses. It now appears that Esco Blaylock knows this perpetrator as Leon, and Sharon Ramroop knew the perpetrator as Ricky.

(A117). The word "confronted" – a curious and cryptic choice of words that implies something other than a typical, open-ended interview of

cooperative witnesses – appeared twice in the document, reflecting that its usage was deliberate.

What did the detectives do to "confront" them? Why did the detectives believe the two teens even needed to be "confronted" to begin with? How did the two teens "exchange" information with each other "relative to the description originally furnished by the various witnesses"? How did the name "Ricky" first become introduced into the conversation? The DD5 does not say. Its spartan description of the encounter, which was the most significant investigative event in the case, stands in marked contrast to the two detectives' other DD5's from the investigation, which were laden with detail.

After the "confrontation" concluded, the detectives showed the teenagers photographs. Ramroop allegedly identified a photograph of Manuel Jimenez, plaintiff's brother, "indicating that his brother was Ricky, the person sought." (A123). Blaylock was then shown, according to the DD5, only a single photograph: "the photo of Ricardo Jimenez." (A123). The DD5 reflects that the two of them were shown the photographs together and does not indicate that Blaylock was shown any photograph other than the one of Ricardo Jimenez.

We should pause here to note the significant change in accounts that took place. Blaylock and Ramroop went into the encounter describing the shooter as a man named Leon whom they both knew well, who had a distinctive appearance. Their original descriptions of Leon aligned with what the bystander witnesses had said of the shooter. Ramroop, *who was not even in the theater*, was the first person to indicate that "Ricky" was the "person sought." This identification somehow was then somehow adopted by Blaylock. They left the precinct that day claiming that the shooter was an entirely different person – Ricardo Jimenez – with a different name and different appearance.

Blaylock was the only eyewitness who ever claimed Jimenez was the perpetrator. The detectives made only one effort to speak to any of the other bystanders about Jimenez, and it did not go as they wanted. On July 17, 1989, Detective Serrano interviewed Lisa Salters, who was one of the bystanders at the theater. She told him that the shooter was a Jamaican man in his early twenties with gold teeth. (A324). Undeterred by her description of the perpetrator, Det. Serrano decided to show her a photograph of Jimenez anyway, the suggestive message of

which is apparent. She did not accept the invitation. She responded that she had seen Jimenez "on other occasions but he was not one of the males which had the argument at the concession stand." (A324).

Despite Salters' definitive statement, Jimenez was detained in connection with the shooting. (A81). But he was released shortly thereafter when Blaylock recanted. (A81).

Even though many people witnessed the shooting, none were even *asked* to come in for a lineup to see if they could identify plaintiff, even when Blaylock recanted and the case was going to be dropped for want of an identification. (A81). The reason defendants preferred to drop the case instead of even *trying* a lineup with other witnesses was because they knew that these other witnesses would not select plaintiff. (A81).

The case then lay dormant for more than a decade, until it was picked up by Det. Wendell Stradford of the NYPD Cold Case squad. (A81). Stradford initiated contact with Blaylock and reenlisted him to testify against Jimenez by using a highly improper identification procedure, in which he effectively told Blaylock whom to implicate. (A82, 125-26). Stradford showed Blaylock multiple photo arrays. In each array, plaintiff was one of the people depicted; all the other

individuals in the array changed. Blaylock later likened the procedure to a game of "Where's Waldo?" Blaylock took the unmistakable message from this procedure and eventually selected Jimenez. (A82). Stradford coerced or otherwise improperly induced Blaylock to agree to testify against Jimenez and knew that the purported identification was untrue. (A82).

Stradford also initiated contact with Andrew O'Brien, a federal inmate who was an associate of Worrell's. (A82-83). O'Brien was a former member of a criminal gang called the Poison Clan. In 1997, O'Brien agreed to plead guilty to federal racketeering charges in the Eastern District of Virginia. (A82, 276). As part of this plea, he was required to sit with agents from the FBI and share with them "all information known to the defendant regarding any criminal activity." (A279). The 32-page memorandum of his interviews with the FBI agents, which spanned four days, reflects that he exhaustively laid bare his knowledge of crimes from his time as a gang member. (A82, 128-59). Some of the crimes he discussed with the agents were incidents in which he was personally involved; many others were not.

One crime he did not claim to have any knowledge of was the Whitestone theater shooting. (A82). When agents showed him a photo of Sean Worrell, O'Brien merely said that "this individual was killed in the Bronx, White Stone Movie Theater." (A148). He did not say that he knew anything about it, let alone that he was there. He even got Worrell's name wrong, referring to him as "Morrell." (A148).

After entering into his plea agreement, O'Brien agreed to provide additional cooperation against Dean Beckford, the leader of the Poison Clan. (A82). As a result of O'Brien's cooperation, the prosecutor responsible for the case, AUSA David Novak, made a motion pursuant to Federal Rule of Criminal Procedure 35 for a sentence reduction. (A83, 160, 1227, 1231). The motion was granted and O'Brien received a five-year reduction. (*Id.*).

O'Brien, however, was not satisfied and continued to write letters to the judge responsible for his case, begging for a further reduction. In one of them, he described himself as a "desperate man." (A83). According to O'Brien, in 1998, he reached out to the Cold Case squad and spoke to a Detective Pheifer. (A553). She did not follow up with O'Brien after this conversation. (A553).

In approximately 2001, Stradford arranged to meet O'Brien in connection with the Worrell case. (A652-653). Even *before* he met O'Brien, Stradford claimed that O'Brien witnessed the movie theater murder being committed by Ricardo Jimenez. (A83). His request to speak with O'Brien, which was relayed by an FBI agent in a memorandum, contained the following sentence: "[O'Brien] witnessed the murder being committed by RICARDO JIMENEZ." (A308). This was impossible for Stradford to have known, because O'Brien did not know Jimenez by name and had not seen a photograph of him before the interview. (A83).

Following a jailhouse meeting with Stradford, O'Brien claimed that Jimenez was the shooter. (A83). According to the memorandum of the FBI agent who accompanied Stradford to the interview, before being shown the photograph by Stradford, all O'Brien said to describe the shooter was that he was "male, slim build, taller than O'BRIEN, squarish hair cut – but not a box top like O'BRIEN's" who "may have been wearing light colored clothing, i.e., beige or brown" and "might have had a part in his hair…" (A312). This was a generic description, filled with equivocations, further reflecting his lack of legitimate

knowledge. The Complaint alleges that O'Brien falsely inculpated Jimenez due to inducement and/or other and further suggestive and/or otherwise improper conduct by Stradford. (A80). In fact, O'Brien had no knowledge that would tend to inculpate Jimenez and Stradford knew O'Brien's claims about Jimenez to be untrue. (A80).

Jimenez was arrested for the murder. As trial approached, O'Brien had approximately ten to fifteen conversations with Stradford. (A553). At some point in these conversations, he was joined by Bronx Assistant District Attorney Lisa Mattaway. (A84). Mattaway became aware of O'Brien's prior sentence reduction and the fact that he had been writing letters to the judge responsible for his case begging for another reduction. (A84).

On June 4, 2007, she spoke with AUSA Novak on the phone and e-mailed him to follow up. (A84). She wrote in her e-mail that she "would like Andrew O'Brien to testify for me here in Bronx Supreme [C]ourt." She requested from Novak copies of "any cooperation agreements he has made in exchange for his testimony with the Federal government and any information regarding favorable treatment he may have received in exchange for his cooperation, including his placement in the witness

protection program." (A84). She continued: "I am aware that he has written numerous letters to the judge in his case requesting leniency and if any of those letters mention the possibility he may testify here in Bronx Supreme [C]ourt for me, I imagine I will need copies of those letters too." (A84).

On June 8, Novak sent her a packet of materials. (A84, 160-61). These materials included, among other things: (1) the FBI memo showing that O'Brien had no apparent knowledge of the shooting in his interviews; (2) his letters to the judge pleading for a further reduction; (3) the prior, successful Rule 35 motion on O'Brien's behalf; and (4) the transcript of O'Brien's prior trial testimony against Beckford. Novak wrote that he was providing her with the documents "for your determination as to whether they are discoverable," flagging them as potential *Brady* materials. (A160-61). As we discuss below, Mattaway not only withheld <u>all</u> of these materials, but repeatedly elicited testimony contrary to the contents of the documents at trial.

Mattaway also enlisted a third witness against Jimenez, an experienced jailhouse informant named Kevin Morrissey. (A86).

Morrrissey claimed that Jimenez confessed to him while they were housed together at Rikers Island. (A86).

Shortly before trial, Mattaway disclosed to Jimenez' lawyer her intention to call O'Brien (identified as "A.O.") as a witness. (A162). In her disclosure, she misrepresented the full nature and scope of her understanding with O'Brien. She wrote: "[C]urrently jailed in Federal Custody for Murder (unrelated) and serving 30 years. Has asked for a letter to be prepared by the undersigned that he can have put in his file stating that he testified for the Bronx District Attorney's Office.'" (A162). This obscured what was actually happening. The letter was being sent *directly* to the AUSA who had filed the prior sentencing motion and corresponded with Mattaway in advance of trial – not put in a "file" for posterity.

**B. The trial**

At trial, three witnesses provided direct testimony against Jimenez: Blaylock, Morrisey, and O'Brien. (A331-1220).

Morrisey testified that Jimenez confessed to him while the two were incarcerated together at Rikers Island. (A366). On cross-examination, he admitted to an extensive criminal history, which

included convictions for fraud. (A376-79). He had a pending charge against him, which he hoped would be adjudicated more favorably due to his testimony against Jimenez. (A391). He admitted that he previously cooperated against two other criminal defendants. (A400).

O'Brien testified that he went to the Whitestone theater with Sean Worrell, Dean Beckford, and "Earl." (A511). All four of them were carrying weapons that night. (A512-13). While he and Worrell were waiting on the popcorn line, O'Brien started arguing with another man. (A512-13). After they exchanged words, the other man said he was going to get a gun and walked out of the theater. (A524-26). O'Brien, Worrell, Beckford, and Earl sat down in the theater to watch their showing. (A529). The man then returned inside, found them, and said, "Yo, when the movie is over, it's me and you." (A529-30). The four of them walked out of the theater after him. (A523). A shootout commenced between the man and O'Brien's group, as several of them were armed. During the shootout, Worrell was killed. (A541).

Mattaway then elicited a series of answers from O'Brien which the documents she had withheld showed were untrue. Even though O'Brien had not said anything about the shooting to the FBI in his 1997

interviews, she elicited testimony from him that he told the FBI in his conversations with them that he was in the Whitestone theater and knew who the shooter was:

> Q: Do you remember the first time you told anyone in law enforcement about what happened?
> A: Yes.
> Q: And when was that approximately?
> A: That was in – that was in – I think it was '96.
> Q: Okay. And do you remember how you first decided to tell somebody about this? Did you write them? Did you call someone? What happened?
> A: Well, I was being – I was being questioned by federal agents and they asked me, you know, of certain things that I knew about and this was one of them.

(A551-53). This, of course, was completely untrue; the undisclosed 1997 FBI memo showed that he said nothing of the sort. (A148).

Mattaway also elicited misleading testimony from O'Brien about what he expected to receive from cooperating. In response to her questions, he claimed that he was testifying because he felt guilty for instigating the argument with the shooter at the concession stand. (A554-55). He also claimed that he was required to testify against Jimenez as part of his existing cooperation agreement with the federal government and that the government would "rip up" the deal if he did not. (A555). Mattaway, who possessed O'Brien's original cooperation

agreement and knew that it provided he could receive further sentencing reductions under Rule 35 if the government deemed it appropriate (A281), was aware this was untrue (A108).

Stradford then bolstered the fiction that O'Brien had revealed knowledge of the shooting to the FBI in his 1997 interviews. He testified that in 1999, after taking on the file, he contacted the DEA to "have them produce some files for me that <u>might have been related to the homicide in question</u>." (A653). Mattaway asked, "Did there come a time that you actually got some paperwork?" (A653). Stradford answered that he did and that, after reviewing it, he contacted the FBI and made arrangements to meet O'Brien. (A653). This paperwork did not even *suggest* that O'Brien had knowledge of the movie theater shooting. Stradford testified that he met with O'Brien in January of 2001 and that O'Brien agreed to implicate Jimenez. (A653-55).

Blaylock testified that he saw "Leon" on the popcorn line and witnessed the shootout that left Worrell dead. (A848). He claimed that Leon was actually Ricardo Jimenez. (A858-60). On cross-examination, he admitted to inconsistencies between his initial description of Leon and Jimenez. (A881-83).

The jury deliberated for almost five days before ultimately convicting Jimenez. He was sentenced to a term of incarceration of twenty-two years to life.

### C. The post-trial proceedings

After the trial was over, AUSA Novak followed up with Mattaway for the letter on O'Brien's behalf. (A90). In response, Mattaway penned a letter – addressed directly to Novak, and not to a "file" – gushing about O'Brien's cooperation. She urged Novak to "give Mr. O'Brien whatever consideration you can in your position." (A90). Novak filed a Rule 35 motion, which resulted in O'Brien receiving an additional sentence reduction. (A90).

Jimenez pursued a direct appeal, which was unsuccessful. He then filed a motion in New York State Supreme Court, Bronx County, pursuant to CPL 440.10. It was denied (A204-247), but following an appeal to the Appellate Division, First Department, the case was remanded for an evidentiary hearing on the limited question of whether there was an explicit "agreement to assist in a sentence reduction for People's witness Andrew O'Brien." (A269-70). The hearing was conducted on the framed question of whether there was a direct *quid*

*pro quo* between O'Brien and Mattaway. Following the hearing, the court found that there had not been a specific *quid pro quo* agreement for O'Brien's testimony. (A199-202). The First Department declined further review. *See People v. Jimenez*, 2018 WL 5726958 (1st Dept. 2018).

After the conclusion of state court proceedings, Jimenez pursued his petition for a writ of habeas corpus. His petition contained a wealth of new evidence relating to his innocence, some of which we will review here.

<u>Esco Blaylock</u>

An investigator working with the Office of the Appellate Defender spoke with Blaylock. (A125-27). In the conversation, Blaylock told the investigator that Stradford showed him multiple photo arrays, in which plaintiff's photograph appeared every time but the other photos changed. He took the unmistakable hint from the fact that plaintiff's photograph was in every array and picked him. He compared the process to a game of "Where's Waldo?" When the investigator asked him to describe Leon, Blaylock immediately clammed up. He did not answer, said he "had to think," and then stopped responding to further

questions. He then "refused to discuss the case any further unless Mr. Jimenez took and passed a polygraph test." (A126).

Sharon Ramroop

Richard Greenberg, Esq., the attorney-in-charge of the Office of the Appellate Defender, interviewed Sharon Ramroop at her home in London. (A118). Her husband invited him inside, where he spoke to Ramroop for 45 minutes. She wrote a statement affirming, beneath a photograph of plaintiff taken in 1989, as follows: "I do not know, and have never known, the person in this photograph. I never identified any picture of an individual known as Leon or Ricky, or any other person." (A121). She also wrote, beneath a copy of the DD-5 claiming she had identified Ricardo Jimenez, as follows: "I…have no recollection of making this statement or identifying a photograph of any person." (A123).

Bystander witnesses

Jimenez adduced affidavits from several people who were present in the theater that night, all of whom gave descriptions of the shooter that did not match him. These included Dean Beckford (who attended the movie with Worrell), Gregory Jones (a security guard), and Lisa

Salter. (A271, 325-26, 329-30). Salter explicitly told the police that Jimenez was not the shooter. (A329-30).

<u>Kevin Morrissey</u>

Jimenez offered extensive evidence in his habeas petition concerning Morrissey's lack of credibility. Morrisey had cooperated in previously undisclosed cases against other defendants and was also a paranoid schizophrenic who reported to a court that another man named "Ray Sanchez" was *living inside his body* and causing him to commit crimes. (A1229, n.3). None of this was disclosed to his defense lawyer before trial.

The petition argued that Mattaway violated *Brady* by failing to produce, *inter alia*, the 1997 FBI memo; various materials relating to O'Brien's cooperation; evidence in her possession relating to Morrissey's prior cooperation and mental illness; and evidence O'Brien was himself a suspect in the murder and was nearly arrested for it.

The District Court (Oetken, J.) granted the petition, finding that Mattaway violated her *Brady* obligations by failing to produce exculpatory evidence relating to Andrew O'Brien, which was

consequential given the weakness of the case against plaintiff. (A1221-50).

First, the court found that Mattaway violated *Brady* by failing to disclose documents reflecting the full extent of O'Brien's understanding of what he would receive for cooperating, including his plea agreement indicating that sentencing reductions were possible; the order granting his prior sentence reduction after his testimony against Beckford; the letters he wrote to the court begging for a further reduction; and the correspondence between Mattaway and Novak prior to trial. (A1227-39). The state courts had rejected Jimenez' argument that these were *Brady* materials, finding that only proof of an explicit *quid pro quo* would have been sufficient to demonstrate a *Brady* violation. Judge Oetken held that this was an unreasonable application of *Brady*: "*Brady* and its progeny require more than just the disclosure of *quid pro quo* agreements; they require that the prosecution disclose any evidence impeaching a witness's credibility." (A1227). Mattaway's failure to disclose this evidence was particularly problematic because she also elicited testimony that misled the jury into believing O'Brien was testifying only because he was required to do so under his existing

arrangement or because he hoped for good time credits or other indefinite consideration.[3] (A1234-35). The court observed, after a review of the post-conviction hearing testimony, that there was reason to question the credibility of Mattaway's denial of a *quid pro quo* agreement with O'Brien, but found that the state courts' decision to the contrary was not objectively unreasonable. *See id.*

Second, the court held that Mattaway violated *Brady* by failing to disclose the FBI memorandum documenting O'Brien's interviews, which showed that he claimed no knowledge of the shooting, even when asked about Worrell specifically. (A1204). Here, too, Judge Oetken found that the *Brady* violation was rendered even more heavily prejudicial because Mattaway elicited testimony that the document itself would have directly contradicted: "[B]oth O'Brien's and Stradford's testimony is contradicted by — or at least undermined by and therefore impeachable through — the FBI report: nothing in the FBI report indicates that O'Brien provided any substantive information about the Worrell murder to federal authorities around 1996." (A1242). The report therefore

[3] Judge Oetken also found that her witness disclosure did not accurately describe the letter she was going to write, which was going directly to Novak, not to a "file." (A1234).

"casts doubt on the circumstances surrounding how O'Brien first became involved in this case and calls into question the credibility of Stradford as a witness and O'Brien's alleged eyewitness identification." (A1245).

The court also discussed the essential lack of credible evidence against Jimenez. It wrote that "it cannot be stressed enough that the case against Jimenez was weak." (A1245). Blaylock originally identified a different person, as did a number of other bystanders. (A1246-48). O'Brien was a compromised witness whose credibility was subject to question. (A1248). And Morrissey "tended to lie for his own benefit, had numerous fraud and larceny convictions, and had a history of mental health problems." (A1248-49). Thus, it wrote, the "entire case rests on two highly suspect eyewitness identifications and a jailhouse snitch – common factors in wrongful convictions." (A1249)(quoting Habeas Petition). It granted Jimenez' petition, vacating the conviction and restoring the matter to pre-trial status.

After a number of pretrial appearances in the Supreme Court, Bronx County, the case was dismissed, on the People's motion, by the Honorable Alvin O. Yearwood. (A78).

**D. Procedural history**

This lawsuit was commenced by filing of a Complaint on August 2, 2023. (A8). Plaintiff filed two Amended Complaints. The first Amended Complaint contained substantive amendments. (A34). The Second Amended Complaint substituted Karen Serrano-Paglia, who was appointed Administrator of the Estate of Michael Serrano, for Serrano. (A72). Before answering, defendants moved to dismiss pursuant to FRCP 12(b)(6). The motion was fully submitted on April 19, 2024.

On November 1, 2024, the District Court's chambers contacted both parties to request that they furnish it with the grand jury minutes. (A1355). Neither party was in possession of the full minutes. But they provided the Court, as it requested, with transcripts of testimony given by Stradford and Blaylock. (SA1-31).

On March 27, 2025, the District Court (Buchwald, J.) granted defendants' motion. (SPA1-52).[4] In its decision, the District Court made numerous factual findings, including on central issues of witness and party credibility.

[4] The Special Appendix is cited as "SPA". The Sealed Appendix is cited as "SA."

First, it dismissed plaintiff's malicious prosecution claim. As to Serrano and Horn, it found that, even if they had induced Blaylock to falsely implicate Jimenez, their conduct lacked a "throughline" to the eventual charges due to the passage of time. (SPA28). It also concluded that, as a matter of law on the pleadings, Serrano and Horn had not improperly induced Blaylock to identify plaintiff because a "single identification is not unlawful when there is an independent basis for the identification…" (SPA30). (Plaintiff specifically alleged that there was no such independent basis in his Complaint and that they had coerced or induced him improperly, *see* A80). As to Stradford, it determined that plaintiff did not rebut the presumption of probable cause that flowed from the indictment because Stradford did not personally testify falsely. (SPA40-41). It did not address, in context of discussing plaintiff's malicious prosecution claim, his further allegation that Stradford induced Blaylock and O'Brien to testify falsely.

Second, the District Court dismissed plaintiff's claim that defendants violated his fair trial rights by fabricating evidence. As to Horn and Serrano, it reiterated its finding that their involvement in the case was too attenuated from the time charges were brought. (SPA33).

It concluded – again, we emphasize, at the *pleading* stage – that Serrano and Horn had employed only "standard investigative procedures" and that Jimenez offered "no proof" otherwise. (SPA35). As to Stradford, it concluded that Blaylock "did not retract his identification of Jimenez" and that there was "no basis to conclude that Det. Stradford coerced an identification or a statement from O'Brien…" (SPA44-45).

Third, it dismissed plaintiff's *Monell* claim against the BCDAO. (SPA47-52). It did not find fault with plaintiff's allegations concerning the office's longstanding failure to discipline prosecutors for ethical violations. It instead determined, despite Judge Oetken's holding, that "reasonable jurists disagreed about whether there was a *Brady* violation" and that "any non-disclosure was not willful or intentional…" (SPA50). It also dismissed plaintiff's failure to intervene claim and his state law claims (SPA35-37, 51).

## SUMMARY OF ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court must accept as true "all factual claims in the complaint" and draw "all reasonable inferences in the plaintiff's favor." *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

An FRCP 12(b)(6) motion is not intended to serve as the vehicle for a judicial assessment of the ultimate merits of a claim. "The role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). The opposing party "will then have ample opportunity to contest the truth of the plaintiff's allegations and to offer its own version" after issue is joined. *Id.* at 59. *See also Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985) ("court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient").

Allegations to the effect that defendant law enforcement officers coerced witnesses to provide false statements or otherwise withheld exculpatory evidence from prosecutors, like any other sort of factual allegation in a Complaint, must be taken as true when evaluating the sufficiency of a pleading. *See, e.g., Isaac v. City of New York*, 2018 WL 5020173, at *7 (E.D.N.Y. 2018) (finding that Complaint's allegations that defendant officers fabricated evidence must be presumed true and collecting cases); *Pizarro v. City of New York*, 2015 WL 5719678, at *5 (E.D.N.Y. 2015) (rejecting defendant's argument concerning probable cause because Complaint alleged that officers coerced a false confession). "Whether the information alleged to have been withheld or falsified was in fact so withheld or fabricated is not for the court to decide on a motion to dismiss." *McLennon v. New York City*, 2015 WL 1475819, at *9 (E.D.N.Y 2015).

Here, the motion court embarked on a lengthy attempt to "evaluate the truth as to what really happened," *Doe*, 831 F.3d at 59, which was improper. Its opinion, which is replete with references to plaintiff's alleged failure to meet evidentiary burdens or identify "proof" or "evidence" in the "record," reads very much like a summary judgment

decision – and, respectfully, this decision resolved many questions that would not appropriately have been determined in that context either. (SPA35, 39, 41, 43).

In the course of its analysis, it resolved a litany of disputed factual issues, many of which required credibility determinations that would typically be for a jury and certainly were not appropriately resolved before the defendants even had joined issue. Among other things, it found that Blaylock's identification of plaintiff was genuine and correct because he did not recant (A37); that the police employed "standard" investigative techniques and that plaintiff failed to offer sufficient "proof" of their misconduct (A35); that Serrano and Horn's single photo identification procedure with Blaylock was not, as a matter of law, suggestive (A30-31); and that Mattaway's failure to produce *Brady* materials was not intentional (A49). It even found that Ramroop "identified a picture of Jimenez" to Serrano and Horn, despite her *explicit* denial of having done so in her sworn statement. (A6, n.5). While this case, like many involving wrongful convictions, comes with a record from the underlying criminal case, that is no substitute for the broader civil discovery mechanisms to which any plaintiff is entitled by

the Federal Rules of Civil Procedure when he or she brings suit. Many of the motion court's findings also directly contradicted determinations Judge Oetken had made. This effectively meant the motion court found that that some of what Judge Oetken held was not even *plausible*.

Plaintiff's Complaint contains detailed factual allegations about the misconduct at issue. There is nothing implausible (*see, e.g., Iqbal*, 556 U.S. at 678) about plaintiff's allegations that Blaylock and O'Brien were induced by officer defendants to give false statements against him or that Mattaway's *Brady* violations followed from decades of neglect by the BCDAO. This case, as Judge Oetken wrote, "rests on two highly suspect eyewitness identifications and a jailhouse snitch — common factors in wrongful convictions." (A1249). Plaintiff's allegations about misconduct by the officer defendants all must be presumed true for present purposes and are sufficient to maintain his causes of action here.

## I. Plaintiff Stated A Valid Claim For Malicious Prosecution Against Serrano, Horn, And Stradford, All Of Whom Were Alleged In The Complaint To Have Engaged In Improper Conduct To Coerce Or Induce False Statements From Witnesses To Implicate Him

Plaintiff stated a valid claim for malicious prosecution. To prevail on a malicious prosecution claim, a plaintiff must show that "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997). Under New York law, "indictment by a grand jury creates a presumption of probable cause" which can be rebutted by "evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (cleaned up). "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Ricciuti*, 124 F.3d at 130 (cleaned up).

At the pleading stage, a plaintiff "is not required to prove that the defendants lied before the grand jury or in their discussions with… prosecutors" and "need only provide sufficiently specific factual allegations regarding the nature and content of their lies in order to survive defendants' 12(b)(6) motion." *Demosthene v. City of New York*, 2019 WL 181305, at *5 (E.D.N.Y. 2019). *See also Buari v. City of New York*, 530 F. Supp. 3d 356, 388 (S.D.N.Y. 2021) ("At the 12(b)(6) stage" plaintiff "need only provide sufficiently specific factual allegations regarding the nature and content of [officers'] lies") (cleaned up); *Graham v. City of New York*, 2018 WL 1157818, at *4 (E.D.N.Y. 2018) ("nonconclusory allegations that the Individual Defendants lied suffice" at pleading stage to overcome presumption of probable cause).

Here, the Complaint pleaded that Serrano, Horn, and Stradford were responsible for fabricating false witness statements from Blaylock and O'Brien and forwarding them to prosecutors. (A80, 81, 83, 92). These allegations should have been presumed true and were both legally sufficient and factually plausible. The inquiry should not have gone any further than this.

The motion court dismissed the cause of action nonetheless. We will discuss its findings as to the particular officer defendants in turn.

### A. Plaintiff stated valid malicious prosecution claims against Serrano and Horn

The motion court dismissed plaintiff's malicious prosecution claims against Serrano and Horn on two bases. First, it found that there was not a "throughline" between their alleged misconduct and the charges against plaintiff, because he was not charged until years later. Second, it found that there was insufficient proof of their misconduct. We will address these findings in turn.

#### i. Serrano and Horn's misconduct in taking the first false statement from Blaylock was a substantial cause of plaintiff's damages

The motion court first found that, even if Serrano and Horn did improperly induce Blaylock to identify plaintiff as the shooter, their conduct lacked "the necessary throughline to Jimenez' 2006 prosecution." (SPA28). In its discussion of this lack of a "throughline," it referenced two separate concepts: (1) that plaintiff could not, due to the passage of time, meet the "initiation" element of a malicious prosecution claim; and (2) that their conduct lacked a "causal link" to

the charges. (SPA28-29). Neither of these issues was appropriately resolved on the pleadings.

First, plaintiff colorably pleaded that Serrano and Horn "initiated" the proceeding against him. A defendant officer "initiates" a proceeding when he "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. NYCTA*, 215 F.3d 208, 217 (2d. Cir 2000). "Showing that the police failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith satisfies the initiation element of malicious prosecution." *Bailey v. City of New York*, 79 F.Supp.3d 424, 449 (E.D.N.Y. 2015). Plaintiff alleged in his Complaint here that Serrano and Horn induced Blaylock to give a false statement. That statement was forwarded to prosecutors and unquestionably was relied upon in the prosecution. These allegations were sufficient to meet the initiation element. *See, e.g., Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (initiation element met where defendant "prepared an alleged false confession and forwarded it to prosecutors"); *Hincapie v. City of New York*, 2022 WL 2870411, at *14 (S.D.N.Y. 2022) (finding

that defendant officers could be found to have initiated proceeding by collaborating to obtain false confession); *Johnson v. United States*, 759 F Supp.3d 425, 446 (S.D.N.Y. 2024) (plaintiffs' allegations that defendant officers fabricated evidence, knowing it would be used to prosecute them, were sufficient to make out initiation element at the pleading stage). Moreover, while the District Court wrote in its opinion that Serrano retired from the police force before 2006, he was not absent from the criminal process against plaintiff. He testified at plaintiff's criminal trial, improbably professing not to remember the significant events of the investigation. (A729). His "throughline" did not cease in 1989.

Plaintiff also colorably pleaded that their conduct proximately caused his damages. It often will be the case that, after a defendant officer commits misconduct in an investigation, other officers or prosecutors will become involved and take actions of their own. That does not insulate the defendant officer from liability for the foreseeable consequences of his own misconduct. "[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to

an ‘independent’ decision that results in a deprivation of liberty.” *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000). *See also Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988); *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007). The determination of proximate cause is typically “one to be made by the factfinder….” *Hain v. Jamison*, 28 N.Y.3d 524, 529 (2016).

Here, plaintiff’s Complaint alleges that Serrano and Horn foisted a false account upon Blaylock, who originally identified a completely different person. That false statement was the root of the entire case against plaintiff. It was not necessary that Serrano or Horn foresee exactly when or how that false statement would come before a prosecutor or jury. For it surely was foreseeable that Blaylock’s false statement would mislead a prosecutor on a charging decision or otherwise distort the judicial process. *See, e.g., Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (“a defendant cannot rely on the alleged existence of a superseding cause when that subsequent decision-maker has been deceived by the defendant's actions”) (citing *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999)); *Bermudez v. City of New York*, 790 F.3d 368, 375 (2d Cir. 2015) (prosecutor’s decision to charge not a

superseding cause of harm because ADA may have been misled by detective's misleading description of identification). If Serrano and Horn had not induced Blaylock to identify plaintiff falsely in 1989, Stradford would not have been speaking to him in 2006.

**ii. While plaintiff should not have been required to offer substantive proof of his allegations at the pleading stage, there is ample evidence to establish the plausibility of his allegations concerning Serrano and Horn.**

The motion court next found that plaintiff "has not rebutted – as it is his burden to do – the strong presumption of probable cause which follows from a grand jury indictment" and advanced allegations against Serrano and Horn "without support in the record." (SPA30).

Plaintiff had no burden to adduce "support" from "the record" for his allegations on a motion to dismiss, let alone to meet any ultimate evidentiary burden. *See, e.g., Doe*, 831 F.3d at 58 ("court at this stage of our proceeding is not engaged in an effort to determine the true facts"); *Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir 2020) ("court must assume the truth of the plaintiff's allegations and avoid resolving factual disputes"). Plaintiff's allegations about the officer defendants' misconduct were supposed to be presumed true for present purposes.

They were legally sufficient to rebut any presumption of probable cause flowing from the indictment. *See, e.g., Buari*, 530 F. Supp.3d at 388.

The motion court's factual findings, in addition to being premature, were, in many respects, contrary to the evidentiary record from the criminal proceeding. We will review its most significant statements in turn.

First, it wrote that "one example of the lack of support for Jimenez' bald allegations is the assertion that after a 'highly suggestive single identification procedure, Blaylock purportedly identified Jimenez as the shooter.'" (SPA30) (citing Complaint). Ironically, this allegation, far from being "bald," came almost **verbatim** from Judge Oetken's opinion. (A1229) (finding that Blaylock "first identified Jimenez in a highly suggestive one-photo procedure"). The allegation also was well founded. The DD5 from the officers' bizarre "confrontation" of Blaylock and Ramroop reflects that Blaylock was shown only "the photo of Ricardo Jimenez" that Ramroop allegedly selected in front of him. (A123).

Second, the motion court concluded that "even if true" that Blaylock was shown only a single photo, plaintiff's allegation that the

procedure was suggestive "would fail as a matter of law because a single photo identification is not unlawful when there is an independent basis for the identification" and Blaylock said he knew Jimenez for two years. (A30-31). This finding both misapprehended the law and the facts.

The motion court's statement about the categorical permissibility of single-photo identification procedures where there is an "independent basis for the identification" did not accurately capture the state of the law. This Court has "consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one." *Wiggins v. Greiner*, 132 Fed. App'x 861, 865 (2d Cir. 2005) (quoting *Mysholowsky v. People,* 535 F.2d 194, 197 (2d Cir.1976)). *See also Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) ("a 'showup' procedure is inherently suggestive because it involves the presentation of a single suspect to a witness by the police…and has accordingly been widely condemned") (cleaned up). Courts have sometimes held that "identification procedures consisting of the display of a single photograph to a witness who states that the witness already knows the perpetrator, in order to confirm the perpetrator's identity, are not

unduly suggestive…" *United States v. Jimenez (William)*, 2020 WL 7231062, at *2 (S.D.N.Y. 2020) (emphasis added). Even the cases allowing confirmatory use of a single photograph after a witness already has identified the perpetrator have engaged in highly fact-sensitive inquiries, taking account of the witness' relationship with and ability to describe the suspect, the conduct of the police, and other attendant circumstances. *See, e.g., Walston v. City of New York,* 289 F. Supp. 3d 398, 403 (E.D.N.Y. 2018), *aff'd on other grounds*, 754 Fed App'x 65 (2d Cir. 2019); *United States v. Bermudez,* 2024 WL 81843, at *4 (S.D.N.Y. 2024). They do not categorically countenance single-photo identification procedures, no matter the circumstances.

The motion court's factual determination that the show-up was not suggestive was erroneous as well. It found – improperly assuming throughout its analysis that the police's description of the events in their official reports was wholly truthful and accurate despite the contrary allegations in the Complaint (*see, e.g., Fink*, 714 F.3d at 740-41) – that the identification could not have been suggestive because Blaylock stated "from the outset that he had known Jimenez for about two years…and that he directly witnessed the crime." (SPA31-32).

Blaylock did not say "from the outset" that he had "known Jimenez for two years." He said at the outset that he knew a different man named *Leon*, who had a completely different appearance than Jimenez, for two years, and that *Leon* was the shooter. When he first spoke to the police, he said that he "knows the shooter for two years from his friends, they introduced me to him, his first name is Leon…." (A114). He provided a wealth of information about Leon, none of which ever appears to have correlated to any details of plaintiff's own background. (A114). It is an obvious fact that Blaylock "originally described the shooter in a manner that did not match Jimenez." (A1229). Blaylock also, after changing his identification from Leon to Jimenez, backed away his claim that he even knew the shooter especially well. He testified at trial that he never personally met the Jimenez version of Leon and had never spoken to or been introduced to him. (A882). The question of how and why his identification changed is a central factual issue in the case.

The motion court also glossed over the extraordinarily irregular process by which the statement came about. There was nothing normal or routine about the identification. Blaylock was brought to the police

precinct; confronted by two seasoned homicide detectives; required to "exchange information" with Ramroop under their supervision, even though she was not even there at the time of the shooting; and then, eventually, shown "the photograph" of plaintiff Ramroop allegedly had picked out in front of him. Even under the version of events <u>in the DD5s</u>, Blaylock did not identify Jimenez, or even provide any descriptive detail about Leon that remotely *resembled* Jimenez, until after he was presented with the show-up photograph. (A117, 123).

For all these reasons, the motion court should not have resolved *on the pleadings* a highly fact-sensitive inquiry about the suggestiveness of a show-up – a procedure that is inherently suggestive – to two teenagers who previously had identified a different person. The motion court's finding was also directly contrary to Judge Oetken's considered conclusion that the procedure employed here was "highly suggestive," which was at least plausible. (A1229, 1246) (citing *United States v. Wade*, 388 U.S. 218, 234 (1967)).

Plaintiff's allegations were further corroborated by Ramroop's statement, which the motion court likewise brushed aside. Ramroop said in her statement that she did not know Jimenez and did not recall

identifying him to the police. The motion court made a remarkable credibility determination concerning her affidavit. It wrote that Ramroop "twenty-three years after she identified a picture of Jimenez…was approached at her home in East Dulwich, London" by an OAD attorney and "signed a statement" "[b]efore the OAD lawyer…" (SPA6, n.5) (emphasis added). By deciding that Ramroop had actually "identified a picture of Jimenez" in the precinct – a fact that she specifically denied in her affidavit (A121-23) – the motion court resolved a foundational credibility in favor of the defendants.

The motion court also found that whatever issues existed as to Ramroop were irrelevant because her "responses to the detectives' questioning played no role in Jimenez's indictment or trial, as Ramroop, who was not an eyewitness, never testified." (SPA37). This fails to take account of the fact that Blaylock only identified plaintiff after (according to the DD5s) he "exchanged information" with Ramroop and then sat in the room with her while she and police selected his photograph before it was shown to him. Ramroop's affidavit calls into question the circumstances under which Blaylock identified plaintiff and the credibility of the defendants' DD5s concerning the "confrontation."

**iii. The motion court also improperly found that, because Blaylock did not recant at trial, his identification of plaintiff must have been correct, which was plainly premature at the pleading stage**

The motion court also apparently determined that Blaylock's identification of plaintiff was credible. It wrote: "Blaylock swore before the grand jury and at trial to his positive identification of Jimenez, an identification he has never recanted in over thirty-five years." (SPA37). Various versions of this statement appear throughout its opinion, all carrying the strong implication, and perhaps the outright finding, that the Court believed Blaylock's identification of plaintiff was credible as a matter of law. *See, e.g.,* SPA31 ("Jimenez's allegations, no doubt deliberately, leave out the fact that seventeen years after the initial interviews by Dets. Serrano and Horn, Blaylock testified under oath before the grand jury and identified Jimenez as the shooter…."). *See also* SPA33, 42-43.

Again, the ultimate truth of Blaylock's trial testimony was not properly resolved at the pleading stage. *See, e.g., Doe*, 831 F.3d at 58; *Oakley*, 980 F.3d at 284; *Buari*, 530 F.Supp.3d at 387. Plaintiff's

allegations that defendants improperly induced Blaylock to identify him falsely were required to be presumed true.

The finding was also, like many others in the decision, contrary to Judge Oetken's opinion, which characterized the case against plaintiff as "weak" and took up at length the reasons to doubt Blaylock's identification of plaintiff. (A1245). While two jurists may disagree on the ultimate merits of a claim, the issue on this motion was whether plaintiff's allegations were *plausible*. The fact that many of plaintiff's allegations align with prior judicial findings provides at least some indication that one can reasonably infer that "the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The motion court's analysis also contained several errors.

First, Blaylock *did* recant his identification in 1989, which was why the case was dropped. (A81, 1247, 907-08).

Second, even though Blaylock testified at the criminal trial, that does not mean he was not improperly coerced or induced by police misconduct. As this Court observed in another case: "Once the witnesses had adopted a story—either because of a suggestive presentation of photographs or because of more overt coercion by the

officers—they might very well have decided to stick with that story or become convinced that it was true, and for that reason have misinformed the ADA when he subsequently questioned them." *Bermudez*, 790 F.3d at 375-76 (2d Cir 2015) (citing studies documenting as much).

Third, Blaylock's conversation with the OAD investigator strongly suggests there is more to his story than we have heard so far about the identity of the shooter. (A125-27). Blaylock initially was forthcoming with the investigator. But when the investigator asked Blaylock to describe the shooter, he said he needed "to think," insisted plaintiff take a lie detector test before he would answer, and then refused to answer further questions.

The motion court's treatment of the investigator's affidavit, like much of its analysis, far exceeded the analytical boundaries of a 12(b)(6) motion. It discounted the affidavit as "inadmissible hearsay" (SPA33, n.18), failing to account for the fact that this was not a summary judgment motion and that plaintiff had no burden to adduce any evidence at all. Regardless of whether the affidavit would have been admissible later in the life span of the case, it was appropriately

considered when assessing the plausibility of plaintiff's allegations of misconduct.

### B. Plaintiff stated a valid malicious prosecution claim against Stradford

The motion court's analysis of Stradford's conduct – which involved, as alleged in the Complaint, knowingly obtaining false statements from Blaylock and O'Brien – was also flawed. It held, based on its review of the grand jury minutes it had requested from the parties, that plaintiff failed to "clear" the "high bar" established by the indictment because "the record is devoid of evidence showing any defect in the grand jury proceedings." (SPA39). In particular, it concluded that, because Stradford did not, in its assessment, personally lie to the grand jury, plaintiff could not sustain a malicious prosecution claim against him. (SPA39-40).

First, again, plaintiff did not have any evidentiary burden here, let alone the obligation to clear a "high bar." *See, e.g., Doe*, 831 F.3d at 58; *Oakley*, 980 F.3d at 284.[5] His allegations were supposed to be presumed true.

[5] While plaintiff did not object, the court did not specify the purpose of its request, nor did it give the parties the opportunity to brief any issues arising from their consideration.

Second, the court focused its analysis of plaintiff's malicious prosecution claim against Stradford *solely* on the question of whether he personally lied to the grand jury. In doing so, it failed to consider the full scope of plaintiff's claims. Plaintiff alleged that Stradford, in addition to testifying falsely in the grand jury, obtained false statements from both Blaylock and O'Brien (A80) – either of which would have been a sufficient basis to sustain a malicious prosecution claim, regardless of what he said to the grand jury. *See, e.g., Bermudez*, 790 F.3d at 377 (presumption of probable cause can be "overcome by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith").

Third, [redacted]

## II. Plaintiff Stated Colorable Fair Trial Claims Against All The Officer Defendants, As Their Fabrication Of Evidence Led To His Unjust Conviction

Plaintiff also stated colorable fair trial claims against all of the officer defendants. The elements of a fair trial claim based on the fabrication of evidence are that "(1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279-80 (2d Cir. 2016). Unlike a malicious prosecution claim, "probable cause is no defense to a denial of the right to a fair trial claim." *Id.* at 278. Even in context of a motion for summary judgment, "plaintiff need only produce some evidence showing that the officer's statement or evidence is false or manipulated." *Haskins v. City of New York*, 2017 WL 3669612, at *11 (E.D.N.Y. 2017). Here, plaintiff stated plausible fair trial claims against Serrano, Horn, and Stradford.

### A. Plaintiff stated valid fair trial claims against Serrano and Horn

The motion court's dismissal of plaintiff's fair trial claim against Serrano and Horn largely tracked its rationale for dismissing the

malicious prosecution claim and was in error for many of the same reasons.

First, it appears to have determined that Blaylock's identification of plaintiff was credible because he never recanted "before the grand jury or at trial," again declining to afford the allegations in plaintiff's Complaint the presumption of accuracy to which they were entitled. (SPA33). This was error, for the reasons discussed above. *See supra*, at 51-52.

Second, it again concluded that there was "no throughline" between their "investigative work and the eventual prosecution of Jimenez seventeen years later." (SPA33). Their misconduct was the foundation of the case against plaintiff and they are liable for its foreseeable consequences.[6] *See supra*, at 41-42.

Third, the court effectively determined, as a factual matter, that the detectives did nothing wrong. It wrote that plaintiff "largely distorts Dets. Serrano and Horn's standard investigative procedures, characterizing them as fabrication" and that he offered "no proof that evidence against him was manufactured, nor are there any

[6] The initiation element of a malicious prosecution claim, which the court previously addressed in its "throughline" analysis, is not a requirement for a fair trial claim.

particularized facts suggesting that Dets. Serrano planted, mishandled, or otherwise invented evidence implicating Jimenez." (SPA 34-35). To say that plaintiff was "distort[ing]" the detectives' "standard investigative procedures," the court needed to find the detectives used "standard investigative procedures" in the first place. In doing so, it accepted the officers' descriptions of their own conduct in their official reports as true, and put the burden on plaintiff to offer "proof that evidence against him was manufactured." This misapprehended the appropriate inquiry on a FRCP 12(b)(6) motion. *See, e.g., Doe*, 831 F.3d at 59. The Complaint alleges, and it must be presumed true here, that the defendant officers coerced and induced Blaylock and Ramroop to implicate plaintiff falsely. Those were not "standard investigative procedures."

### B. Plaintiff stated a valid fair trial claim against Stradford

The motion court also erroneously dismissed plaintiff's fair trial claim against Stradford, despite well-pleaded allegations of misconduct in his dealings with both Blaylock and O'Brien.

#### i. Plaintiff pleaded plausible allegations of misconduct by Stradford relating to Blaylock

With regard to Blaylock, the court wrote that plaintiff "conveniently fails to highlight that Blaylock identified Jimenez as the shooter at least twelve years before Det. Stradford had any involvement" and that Stradford therefore was not responsible if the account was false. (SPA42).

By its analysis, the motion court subjected plaintiff to a classic Catch-22. It found that there was not a "throughline" between Serrano and Horn's conduct and the prosecution because plaintiff was not tried until after Blaylock spoke with Stradford in 2006. But it then found that *Stradford* was not responsible for the false identification either because Blaylock had previously inculpated plaintiff when speaking to Serrano and Horn in 1989, leaving no officer ultimately responsible for a false, wrongfully induced identification.

None of this was appropriately resolved on a motion to dismiss. It is plausible that Serrano and Horn, as the Complaint alleged, knowingly induced Blaylock to falsely implicate Jimenez, rather than Leon, a Jamaican man with blond streaks in his hair. It is likewise plausible that Stradford, finding Blaylock either unable to identify

plaintiff or unwilling to proceed, improperly induced him to reiterate the false statement against plaintiff he had given previously. The "Where's Waldo?" game Blaylock described was obviously suggestive and improper. *See, e.g., Simmons v. United States,* 390 U.S. 377, 383 (1968) (danger of suggestiveness is increased if police show witness "pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized").

#### ii. Plaintiff pleaded plausible allegations of misconduct by Stradford relating to O'Brien

We will turn now to the motion court's discussion of Andrew O'Brien. The motion court wrote that Stradford was not "a juror responsible for evaluating the truth of O'Brien's testimony" and that "there is no basis to conclude that Det. Stradford coerced an identification or statement from O'Brien, nor is there a suggestion that Det. Stradford showed O'Brien fabricated evidence to compel him to implicate Jimenez." (SPA 44-45). This determination of yet another ultimate issue of fact at the pleading stage was, as with the many other, similar findings in the opinion, premature. *See, e.g., Doe*, 831 F.3d at 58; *Oakley*, 980 F.3d at 284; *Buari*, 530 F.Supp.3d at 387.

The motion court bypassed plaintiff's allegations in its analysis. The Complaint did not allege that Stradford passively received O'Brien's account in the manner of a juror, dutifully recorded it, and then forwarded it to prosecutors for their independent evaluation. It alleged that he improperly and suggestively induced O'Brien to implicate plaintiff falsely (A83-84), which the court was required to have presumed true on this motion. *See, e.g., Fink*, 714 F.3d at 740-41 (court must accept as true "all factual claims in the complaint").

There was also substantial evidence to support plaintiffs' allegations – and this is yet another instance of the motion court determining that findings from Judge Oetken's opinion were not even plausible. When O'Brien spoke to the FBI in 1997, he was shown a photograph of Worrell, but he did not profess to have any knowledge of who perpetrated the shooting. (A148). Nonetheless, Stradford somehow was able to say O'Brien would implicate Jimenez before speaking to him. (A308). When Stradford arrived, O'Brien was able to offer only the most generic possible description of the shooter (A312), which further reflects he needed significant assistance from Stradford before identifying a person he had never previously known, and whom he had

not seen for (if he was in the theater at all) seventeen years. Both O’Brien and Stradford then, at trial, obfuscated how they came in contact with one another in the first place. As Judge Oetken wrote: “[T]he 1997 FBI Report casts doubt on the circumstances surrounding how O'Brien first became involved in this case and calls into question the credibility of Stradford as a witness and O'Brien’s alleged eyewitness identification.” (A1245).

O’Brien was nearly *himself* arrested for the murder. A note made by “Sgt. Larkin” in March of 1996 reflected that a detective had information that Worrell was killed by “Andy O’Brien – Virginia” and that he might be arrested. (A307).

The motion court also wrote that Stradford could not have been responsible for a false identification because “Jimenez’ position is that O’Brien…needed no inducement from Det. Stradford to testify falsely or otherwise.” (SPA45). O’Brien did not know Jimenez by name or through any prior encounter. He was, in his own words, “desperate” for a sentencing reduction. (A83). But to obtain a reduction, he needed to be pointed in the right direction. In this regard, Stradford and O’Brien were perfect counterparts: an officer willing to use improper means to

obtain false statements to close an investigation and an inmate facing a lengthy sentence who had at least some prior acquaintance with the victim and was willing to implicate the primary suspect in the investigation in return for a sentencing reduction.

## III. Plaintiff Stated Colorable Claims For Failures To Intervene By Serrano And Horn

The motion court also dismissed plaintiff's failure to intervene claim, which alleged, *inter alia*, that Serrano and Horn failed to intervene to stop one another's constitutional violations. (SPA35-37).

A "law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). An officer who fails to intervene will be held liable when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F Supp. 2d 501, 512 (S.D.N.Y. 2008).

First, the motion court suggested that plaintiff's allegations were too "vague" in describing defendants' misconduct. (SPA35). It is not

unusual that, before discovery, a plaintiff will lack intricate knowledge of the interactions between involved officers in obtaining false evidence. Where "a plaintiff has properly alleged a constitutional violation, he is entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene." *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (cleaned up). *See also Sullivan v. City of New York*, 2018 WL 3368706, at *13 (S.D.N.Y. 2018).

Second, the motion court implied that it was problematic for plaintiff to bring a failure to intervene claim against Serrano and Horn for their interrogations of Blaylock and Ramroop because "only those who are direct objects of a failed intervention have standing" to bring a fair trial claim, suggesting that plaintiff's own rights were not violated. (SPA35-36). This was incorrect. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial…" *Ricciuti*, 124 F.3d at 130. Plaintiff's own rights were violated by the police's fabrication of evidence against him. *See, e.g., Breton v. City of New York*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019)

(involvement in fabrication of evidence against plaintiff represented valid basis for failure to intervene claim, as facts were "sufficient to create a plausible inference that [supervising officer] knew that the reports contained misstatements and omissions).

Third, the motion court reiterated some of the findings it had made as to Ramroop and Blaylock on other points. (SPA37). As to Ramroop, it found that she "never testified" and that any constitutional violation that took place during the detectives' confrontation of her could not have caused plaintiff any damages. This finding failed, as discussed above, to take account of the fact that Blaylock's identification of plaintiff effectively piggybacked on Ramroop's. *See supra*, at 49. As to Blaylock, it again found that, because he "has never recanted in over thirty-five years," (SPA37) his identification of plaintiff must have been legitimate. This reasoning is flawed for the reasons discussed more fully above. *See supra*, at 51-52. He *did* recant; the fact that a witness has not yet recanted is not a basis for dismissing a case on the pleading; and the bizarre circumstances of his interrogation and his statements to the OAD investigator make it more than plausible that his statement came about through improper means.

## VI. Plaintiff Pleaded A Colorable *Monell* Claim Based On The Bronx County District Attorney's Office's Longstanding Failure To Discipline Prosecutors For Committing Misconduct In Pursuit Of Convictions.

Plaintiff pleaded a colorable *Monell* claim based on the BCDAO's longstanding failure to impose discipline or otherwise take corrective action in response to its ADAs' violations of *Brady* and other ethical obligations. (A96-101, 105-07).

Although municipalities are not vicariously liable for constitutional violations perpetrated by their employees, when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury ... the government as an entity is responsible under §1983." *Monell v. Department of Social Services of City of New York,* 436 U.S. 658,694 (1978). A municipality will be held liable when, "through its deliberate conduct, [it] was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d. Cir. 2008). Thus, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may "be properly thought of as a city policy or

custom' that is actionable under §1983." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d. Cir. 2004) (cleaned up).

"A long and persistent history of feckless training and discipline practices by a district attorney might give rise to municipal liability." *Bailey*, 79 F. Supp. 3d at (cleaned up); *Walker v. City of New York,* 974 F.2d 293, 301 (2d Cir. 1992) (holding that "Kings County District Attorney acted as a municipal policymaker" for City and that the plaintiff's allegations of deliberate indifference to *Brady* obligations "by the District Attorney provide a proper basis for holding the City liable"); *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019) (denying City's motion to dismiss *Monell* claim against Queens County District Attorney's Office).

The Complaint here contains detailed allegations regarding the BCDAO's deliberate indifference to misconduct by its attorneys in pursuit of convictions and an Appendix listing numerous cases in which ADAs' ethical violations resulted in reversals. (A96-101; 105-07). In *Buari v. City of New York*, 530 F. Supp. 3d 356 (S.D.N.Y. 2021), the court denied the City's motion to dismiss an almost identical *Monell* claim against the Bronx DA's office, which alleged a similar pattern

over a similar time period and made similar allegations. *See id.* at 407-08.

The motion court did not find any deficiency in plaintiff's allegations concerning the BCDAO's deliberate indifference to its ethical obligations in other cases. But it dismissed the claim nonetheless, finding that the "record establishes that the ADA's actions lacked the required intentionality" and her violation "was not so glaringly intentional or flagrant as would be required to satisfy the civil *Brady* standard." (SPA49).

The court's holding on the *Monell* cause of action had both legal and factual components, which we will discuss separately.

### A. The motion court erroneously found that plaintiff was legally required to make a showing as to Mattaway's intent in violating *Brady*

First, the court found that "[w]hen bringing a §1983 *Brady* claim, a plaintiff must not only show that police or prosecutors withheld material exculpatory evidence, but that such evidence was willfully or intentionally withheld." (SPA49). It cited two cases in which this Court assumed without deciding that a police officer's *Brady* violation needed to be intentional to give rise to civil liability. *See Bellamy*, 914 F.3d at

751 ("We have suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional"); *Fappiano v. City of New York*, 640 Fed. App'x 115, 118 (2d Cir. 2016) ("We have never held that anything less than an intentional *Brady* violation establishes a §1983 due process claim for damages…and we decline to do so here"). This Court has never foreclosed the possibility that a police officer's unintentional *Brady* violation can, in an appropriate case, result in the imposition of liability.

This Court also has not followed any such intent requirement in the conceptually distinct context of when a trial prosecutor's *Brady* violation can serve as a predicate for a *Monell* claim against a District Attorney. This Court's decision in *Walker v. City of City of New York*, 974 F.2d 293 (2d Cir. 1992), is instructive. In that case, the plaintiff was convicted of felony murder, but secured the vacatur of his conviction when it emerged that the prosecutor failed to produce evidence which undermined the reliability of a key witness' account, in violation of *Brady*. The plaintiff alleged that the DA's office failed to provide any training for, or monitoring of, its ADAs to ensure compliance with their *Brady* obligations and was deliberately

indifferent to the rights of criminal defendants. This Court found that "the evidence withheld in this case, though clearly *Brady* material, was not of the sort that one would obviously turn over, absent some knowledge of *Brady*." *Id.* at 300 (emphasis added). It nonetheless held that "a jury could find that the complete failure to train or supervise alleged here would likely result in ADAs making the wrong choices about turning over this kind of *Brady* material." *Id.* The *Brady* violation in that case was not, to use the motion court's words, "glaringly intentional or flagrant." But it represented a valid predicate for *Monell* liability nonetheless.

For both these reasons, the motion court erred in finding that this Court's precedent *required* that a prosecutor's *Brady* violation have been intentional to serve as a predicate for a *Monell* claim.

### B. The motion court erroneously found that Mattaway's violation was unintentional

As a factual matter, to the extent the court made a determination as to Mattaway's intent, it again reached significantly farther than was necessary on a motion to dismiss – and that is even if we put aside the fact that plaintiff was not legally required to show her intent to begin with. Plaintiff alleged in his Complaint that Mattaway's *Brady*

violations were "clearly willful." (A108). That allegation was required to be presumed true.

The court's analysis also was problematic on its own terms. The motion court analyzed Mattway's "intent" without ever considering the credibility of the specific excuse she offered (which we will return to in a moment).[7] It instead conflated its assessment of the severity of the *Brady* violation with the separate issue of Mattaway's own intentions. It found that that because there was a disagreement among "reasonable jurists" about whether *Brady* was violated, the "lack of consensus clearly demonstrates that any alleged *Brady* violation was not… glaringly intentional or flagrant…" (SPA 50).[8]

The motion court failed to take account of the specific nature of the findings in the habeas decision. Under 28 U.S.C. § 2254, habeas relief can only be granted if (as relevant here) the state court's application of *Brady* was "contrary to, or involved an unreasonable application of,

[7] While the court found it important that state court judges determined that the violation was unintentional, these findings were not binding in any respect in the civil case because the conviction was vacated. *See, e.g., Dukes v. City of Albany*, 289 F.Supp.3d 387, 393 (N.D.N.Y. 2018) ("a vacated criminal conviction cannot have preclusive effect").

[8] It also questioned whether *Brady* was violated *at all*, writing that "the issue before this Court is not which judge or judges were correct in their view of the law." (SPA50).

clearly established Federal law, as determined by the Supreme Court of the United States…" To find that standard met, a habeas court must conclude that there was "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). *See also Fuentes v T. Griffin*, 829 F.3d 233, 253 (2d Cir. 2016). Judge Oetken found that the state courts' rejections of plaintiff's *Brady* claims unreasonably applied federal law – which necessarily signifies that it was not a point on which "reasonable jurists" could have "disagreed." (SPA50).

Mattaway's excuse also was highly dubious. She claimed that, when the materials arrived from AUSA Novak, she had "only recently returned from a vacation" and "must have inadvertently neglected to look at and disclose the documents the AUSA sent me," while professing to have "no independent recollection of what I did with these materials." (A303). This dog-ate-my-homework excuse is not credible, even on its face. Mattaway spoke to, and then e-mailed, AUSA Novak to request the documents on June 4, 2007. (A84). He sent her the documents on June 8 and jury selection started on June 28. (A292). The documents

arrived when Mattway was knee-deep in trial preparation, shortly after she specifically requested them, and it is extremely hard to believe she did not review them. At the very least, the credibility of her excuse was not properly determined at the pleading stage.[9]

## CONCLUSION

WHEREFORE, it is respectfully submitted that the Decision and Order of the court below should be reversed and that plaintiff-appellant should be granted such other and further relief as the Court may deem just and proper.

Dated: New York, New York
June 10, 2025

Respectfully submitted,

KELNER & KELNER, ESQS.
*Attorneys for Plaintiff-Appellant*
*Ricardo Jimenez*

By: /s/ Joshua D. Kelner
Joshua D. Kelner (JK3303)
7 World Trade Center, Suite 2700
New York, New York 10007
(212) 425-0700

---

[9] The motion court dismissed plaintiff's state law claims because it did not find "any constitutional violations by any individual defendant." (SPA51). These claims should be restored alongside plaintiffs' remaining causes of action.

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

1. This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because this brief contains 13,999 words, excluding the signature block.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font.

Dated: New York, New York
June 10, 2025

/s/ Joshua D. Kelner
JOSHUA D. KELNER

# SPECIAL APPENDIX

# **Table of Contents**

**Page**

Memorandum and Order of the Honorable Naomi Reice Buchwald,
dated March 27, 2025, Appealed From ....................................... SPA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
RICARDO JIMENEZ,

Plaintiff,

- against -

CITY OF NEW YORK, WENDELL STRADFORD, KAREN SERRANO-PAGLIA, as Administrator of the Estate of MICHAEL SERRANO, CHRISTOPHER HORN, and BRONX COUNTY DISTRICT ATTORNEY'S OFFICE,

Defendants.

--------------------------------------X

**MEMORANDUM AND ORDER**

23 Civ. 06751 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Ricardo Jimenez ("Jimenez") has brought this lawsuit, see ECF No. 1, asserting violations of 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") following a successful habeas petition, see Jimenez v. Graham, No. 11 Civ. 6468 (JPO), 2022 WL 2789217 (S.D.N.Y. July 15, 2022) ("Oetken Opinion -- Habeas"). Jimenez now seeks monetary damages against multiple defendants, including the City of New York, the Bronx County District Attorney's Office (the "Bronx DA's Office"), and three New York City Police Department Detectives[1] ("Dets.") for purported violations of Section 1983 and state negligence and malicious

[1] The three detectives are: Wendell Stradford, Christopher Horn, and Michael Serrano. Karen Serrano-Paglia is named as a defendant as Administrator of the Estate of Detective Serrano.

prosecution laws. Broadly described, Jimenez asserts that his second degree murder conviction arising from a 1989 fatal shooting resulted from police and prosecutorial wrongdoing, as well as systematic failures within the Bronx DA's Office. See ECF No. 35 ("Second Amended Complaint" or "SAC"). Defendants moved to dismiss for failure to state a claim. See ECF No. 45. For the following reasons, defendants' motion is granted, and Jimenez's Second Amended Complaint is dismissed with prejudice.

## A. Factual Background[2]

### 1. The 1989 Murder and Initial Investigation

In July of 2007, a jury convicted Jimenez of murder in the second degree for shooting and killing Sean Worrell ("Worrell")

[2] Unless otherwise noted, the facts considered and recited herein are drawn from Jimenez's Second Amended Complaint and are accepted as true for the purposes of the instant motion. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). However, any legal conclusions raised in plaintiff's complaint need not be accepted as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Additionally, we rely on the facts outlined in the various state and federal court opinions issued in Jimenez's case since 2006, which are incorporated by reference into the complaint given Jimenez's "reliance on the terms and effect" of such opinions. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). Also, on a motion to dismiss, a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).

nearly two decades earlier at the Whitestone Movie Theatre in the Bronx. See SAC ¶¶ 1-2, 26-29, 46. Shortly after midnight on July 3, 1989, bystanders at the theatre observed two men, including the victim Worrell, in a verbal dispute in the concession line. Id. ¶¶ 2, 46. During the confrontation, "the shooter stated that he was going to get his gun and thereafter, was seen leaving the movie theater." People v. Jimenez, No. 3825/2006, at *3 (Sup. Ct. Mar. 4, 2014) (Sackett, J.) ("Sackett -- § 440.10 Opinion").[3] At that point, Worrell left the concession stand and entered a theatre playing the "Batman" movie. Id. After taking his seat, and as "the movie was about to begin, the shooter returned, entered the crowded Batman theater, and approached Mr. Worrell. . . . Words were exchanged between the parties, weapons were drawn and shots were fired." Id. Patrons scattered at the sound of the gunshots, and Worrell lay dead in the aisle from two gunshot wounds. Id.

The NYPD began investigating, and the case was assigned to Dets. Serrano and Horn from the Bronx Detective Squad. SAC ¶¶ 47-49. Dets. Serrano and Horn took several witness statements. Id. ¶¶ 51-53. One witness reported to Det. Serrano that "[t]wo males, Black, were arguing about who was in line first [at the concession counter]. One guy said 'I'll come back and shoot your ass.' . .

[3] This Decision and Order by Supreme Court Justice Robert A. Sackett is discussed at some length below. See infra at 12-15.

. [T]hey had words in Rastafarian." See SAC, Ex. A ("DD-5") at RJ-000907. Another witness said she "overheard a verbal altercation between two males whom she described as sporting flat-top haircuts, and wearing a lot of gold." Id. at RJ-000093. This witness described the shooter as a "tall and thin" man "in his early twenties" who spoke with a "Jamaican accent[]." Id. Yet another witness reported that a "thin" young man, "about 6' tall, short cropped hair (black) with a thin blond streak of hair running along the side of his head" who wore "numerous rings on his fingers, [and] a large medallion . . . from a chain around his neck," argued with the victim in "the concession stand [while] waiting to be served." Id. at R-000094.

Esco Blaylock ("Blaylock"), another eyewitness, worked at the movie theatre at the time of the shooting. SAC ¶ 52. During an interview with Dets. Serrano and Horn, Blaylock described an argument that had broken out at the concession stand between Worrell and another man, who Blaylock identified as a black man named "Leon." See SAC, Ex. B ("DD-5") at R-000085. Blaylock stated that he had known "Leon" for "about 2 years" after having "met . . . through a friend." Id. Blaylock noted that he knew "Leon" to be a "violent guy and heavily involved in selling drugs." Id. Blaylock also described "Leon's" physical appearance to the

detectives, relaying that he was "about 5'10", 175 lbs., [with a] high-top haircut with shaved sides, and two blond streaks running along the side of his head," who "look[ed] Puerto Rican, and c[ould] mimic [sic] a Jamaican accent." Id. Blacklock further told the detectives that "Leon" had a girlfriend, who Dets. Serrano and Horn later identified as Sharon Ramroop.[4] Id. at R-000917.

The detectives interviewed Sharon Ramroop in the presence of her mother. Id. at R-000087. Ramroop said she knew "Leon" and similarly described him as a man of "Jamaican and Indian Extraction" and a "flashy dresser" with "a flat top haircut." Id.

Dets. Serrano and Horn conducted follow-up interviews with Blaylock and Ramroop in the police precinct about one week after the shooting. See SAC, Ex. D at RJ-002100. As the detectives' DD-5 report describes:

[4] It should be noted that the account that Blaylock originally offered to Dets. Serrano and Horn, as memorialized in their DD-5 reports, see SAC, Exs. B-C, is consistent with Blaylock's 2006 testimony before the Grand Jury. In that testimony, Blaylock explained that, during his shift at the movie theatre, he was "talking with [his] girlfriend at the time an argument" broke out in the concession line between a man and "the perp, which was known to [him] as Leon." See Grand Jury Minutes ("G.J. Min.") at 4:13-5:4. Blaylock stated that the argument ended and the men parted ways. Id. at 5:5-7. Shortly thereafter, Blaylock, who had entered the theatre showing the Batman movie, noticed that "Leon" had returned and "was looking around . . . searching for something [in the theatre]. And he seen the guy [he argued with in the concession line]. Words were exchanged. And I heard two shots ring out. You know, I seen the flash from the gun and that's when I went outside along with the crowd." Id. at 5:5-6:21. Blaylock then described his 2006 meeting with Det. Stradford. Id. at 20:15-21:21. He stated that Det. Stradford asked several questions about the shooting before showing him a photo array, in which he "recognized the guy that I know as Leon, the guy that shot the other guy." Id. at 21:10-21.

> Both, Esco [Blaylock] and Sharon [Ramroop] viewed photos. Sharon Ramroop identified a photo as that of Mannel Jimenez, indicating that his brother as Ricky, the person being sought. A search of the files produced a photograph of Ricardo Jimenez. Mr. Esco Blaylock identified the photo of Ricardo Jimenez as the shooter in this case, and the person known to him as 'Leon.' Sharon Ramroop stated that she knew this individual as 'Ricky.'

Id.[5]

After linking the descriptions of the shooter to Ricardo Jimenez, the detectives arrested him in connection with Worrell's murder. SAC ¶ 62. However, Jimenez's detention was only temporary because Blaylock failed to appear for a follow-up lineup after he was "instructed by his employer at the Whitestone Theatre not to speak with the police about the Batman shooting and because his mother became scared and told Mr. Blaylock that she did not want him cooperating with the police." Sackett -- § 440.10 Opinion at *8 n.13. At that point, as there was insufficient evidence to hold Jimenez or pursue an indictment against him, Dets. Serrano and Horn released him. SAC ¶ 62. The case then went cold and would remain so for the next eleven years. Id. ¶¶ 63-64.

---

[5] It should be noted that Ramroop, on October 26, 2012 -- twenty-three years after she identified a picture of Jimenez -- was approached at her home in East Dulwich, London, by an attorney from the Office of the Appellate Defenders ("OAD"). SAC, Ex. D. Before the OAD lawyer, she signed a statement indicating that she "would like to have nothing further to do with this matter" and that she "d[id] not know, and [has] never known, the person in th[e] photograph" of Jimenez that she was shown. Id.

**2. The Cold Case is Revived**

In or around the year 2000, Det. Wendell Stradford from the NYPD Cold Case Squad reopened the Worrell murder investigation. Id. ¶¶ 4, 64. Det. Stradford studied the case intermittently over the next six years. Id. ¶¶ 64-78. He re-interviewed Blaylock, the eyewitness and movie theatre employee, and showed him "multiple photo arrays" of possible suspects. Id. ¶¶ 65-67. From the arrays, Blaylock identified Jimenez as the shooter, signed his name to the back of Jimenez's photo, and agreed to testify against him at trial. Id.; see also Sackett -- § 440.10 Opinion at *10. Det. Stradford also interviewed Andrew O'Brien ("O'Brien"), a former associate of Worrell's, who was serving a 30-year sentence for an unrelated crime. SAC ¶¶ 68-69. O'Brien also implicated Jimenez as Worrell's murderer. Id. ¶ 74.

Following Det. Stradford's investigation, Bronx County Assistant District Attorney Lisa Mattaway ("ADA Mattaway") was assigned to the Worrell case. Id. ¶ 78. ADA Mattaway met with O'Brien, who agreed to testify against Jimenez. Id. ¶¶ 79, 86. ADA Mattaway "gave no . . . promise[s] to Mr. O'Brien other than the promise to write a letter on his behalf" in connection with his federal case. See People v. Jimenez, No. 3825/2006, at *3 (Sup. Ct. June 29, 2018) (Torres, J.) ("Torres, J. -- Remand").

Ahead of O'Brien's testimony, ADA Mattaway contacted Assistant U.S. Attorney ("AUSA") David Novak on June 4, 2007, who had prosecuted O'Brien in the criminal case in Virginia for which he was serving a thirty-year sentence, and she requested copies of "any cooperation agreements [O'Brien] has made in exchange for his testimony with the Federal government and any information regarding favorable treatment he may have received in exchange for his cooperation." SAC ¶ 82.

In response, AUSA Novak sent ADA Mattaway "three to four boxes of materials" related to O'Brien. Sackett -- § 440.10 Opinion at *20. Included therein was an FBI-302 report dated February 14, 1997, which contained notes from interviews with O'Brien conducted by FBI agents in connection with his guilty plea in the Eastern District of Virginia to a murder-related RICO charge. See SAC, Ex. F ("O'Brien Proffer"). As recited in the FBI-302 Report, O'Brien was "interviewed regarding homicides which occurred in New York City" about which he "said he had hearsay knowledge." Id. at RJ-001956. Separately, O'Brien was shown a collection of photographs. Id. at RJ-001974. In one of those photographs, O'Brien identified Sean Worrell. Id. at RJ-001976. The 302 report states: "Sean Morrell, also known as 'Shaka' – O'Brien said this individual was killed in the Bronx, White Stone [sic] Movie

Theatre, and his mother lived on 45th Street in Brooklyn." Id. In addition to the FBI report, AUSA Novak also provided to ADA Mattaway: (1) letters O'Brien had sent to the judge in his case seeking a sentencing reduction, describing himself as "desperate"; (2) the transcript of O'Brien's prior trial testimony against a gang leader that led to a reduction in his sentence; and (3) an AUSA's prior, successful motion to secure a sentencing reduction for O'Brien. SAC ¶ 83. AUSA Novak noted that the materials were provided for ADA Mattaway's "determination as to whether they are discoverable in [the] prosecution of Ricardo Jimenez." See SAC, Ex. G ("Novak Email") at RJ-001915.

Jimenez was arrested as a suspect in Worrell's murder on August 31, 2006. SAC ¶ 87. A few days later, on September 2, 2006, the grand jury, after hearing evidence presented by ADA Mattaway, voted to indict Jimenez for Worrell's murder. See Sackett -- § 440.10 Opinion at *3. Pending trial, Jimenez was detained at Rikers Island, SAC ¶ 98, where, according to his cellmate, Kevin Morrissey ("Morrissey"), he confessed to murdering Worrell in the 1989 shooting, id. ¶ 99. However, Jimenez disputes this claim, see id. ¶ 101, and suggests that Morrisey was a schizophrenic and a "serial jailhouse informant" with "a litany of pending charges against him," id. ¶¶ 99-101.

Jimenez's case proceeded to trial, which began on June 20, 2007. See Sackett -- § 440.10 Opinion at *4. Over the course of three weeks, "[t]he jury heard testimony from approximately twelve prosecution witnesses." Id. However, Jimenez "did not testify and did not present any witnesses." Id. On July 13, 2007, after five days of deliberations, the jury found Jimenez guilty of second degree murder. Id.; see also SAC ¶¶ 7, 28. He was later sentenced to twenty-two years to life. SAC ¶ 29.

Jimenez served roughly fifteen years of that sentence before his conviction was vacated pursuant to Judge Oetken's habeas opinion, which found Brady violations by the prosecution. See Oetken Opinion -- Habeas at *3-13; see also infra at 23-25. Thereafter, the Bronx DA's Office opted not to retry him. SAC ¶¶ 39-40. Judge Oetken's habeas decision followed Jimenez's numerous, but unsuccessful, post-conviction challenges in state court, which are discussed in the following section.

## B. Post-Conviction Challenges

### 1. Motion to Set Aside the Guilty Verdict

Jimenez's first post-conviction effort was a 2007 motion to the trial court pursuant to New York Criminal Procedure Law ("NYCPL") § 330.30(2) to set aside the guilty verdict on the grounds of improper juror conduct. People v. Jimenez, 847 N.Y.S.2d

904 (Sup. Ct. 2007) (Torres, J.). The motion was based on a juror's (Juror Ten) post-trial statement to defense counsel that some jurors had been disrespectful, intoxicated, and overbearing during deliberations. Id. The trial court rejected these allegations, noting that during trial, it conducted two in camera inquiries with Juror Ten and others, and that Juror Ten had repeatedly assured the court that she could "definitely" continue deliberating and reach a verdict. Id. The court also noted that Juror Ten confirmed her verdict when polled and did not speak out when the judge invited the jury to do so in an informal post-verdict meeting in the jury room. Id. Relying on the well-established principle that "a verdict may not be impeached by probes into the jury's deliberative process" absent "a showing of improper influence," the trial court found no "legal basis upon which to grant this motion" or a need to "conduct a hearing." Id.

**2. Direct Appeal**

In 2010, Jimenez filed a direct appeal to the Appellate Division, see SAC ¶ 30, arguing that: (1) the verdict was against the weight of the evidence; (2) the trial court erred in refusing to charge a justification defense; (3) the prosecution engaged in a pattern of misconduct; (4) his speedy trial rights were violated; and (5) the sentence was excessive, see People v. Jiminez, 71

A.D.3d 483, 483–84, 896 N.Y.S.2d 69, 69–71 (1st Dept. 2010). The four-judge panel rejected all of Jimenez's arguments and unanimously affirmed the verdict and sentence. Specifically, the court concluded:

> The verdict was not against the weight of the evidence. There is no basis for disturbing the jury's determinations concerning credibility. Two witnesses (one of whom was acquainted with defendant) having no connection with each other identified the same person and gave essentially similar accounts of the incident. Moreover, defendant's confession to an informant contained significant details that confirmed the informant's credibility. The jury could have reasonably concluded that these factors outweighed the alleged deficiencies in the People's case.

Id. at 71 A.D.3d at 483, 896 N.Y.S.2d at 70 (internal citations omitted).[6]

Leave to appeal the decision was denied by a judge of the New York Court of Appeals. People v. Jiminez, 15 N.Y.3d 752, 933 N.E.2d 223 (2010); see also SAC ¶ 30.

**3. Motion Under N.Y.C.P.L. § 440.10 and Ensuing Appeal**

i. Jimenez's § 440.10 Motion

[6] The Appellate Division also rejected claims of pre-indictment delay and challenges to the prosecutor's summation. Id. at 71 A.D.3d at 484, 896 N.Y.S.2d at 71. Also, it bears noting that the Appellate Division affirmed the trial court's decision not to charge justification, finding that Jimenez "did not preserve his argument that a justification charge was supported by a portion of his statement to the informant (a statement defendant claims to be the informant's fabrication), and we decline to review it in the interest of justice." Id. at 71 A.D.3d at 484, 896 N.Y.S.2d at 70.

The following year, on September 23, 2011, Jimenez, represented by the Office of the Appellate Defender, filed a motion pursuant to NYCPL § 440.10 (1)(g) and (h) in the Supreme Court, Bronx County. See SAC ¶ 31. Jimenez raised several claims: (1) actual innocence; (2) insufficiency of trial evidence; (3) Brady violations; (4) pre-indictment delay; and (5) ineffective assistance by trial counsel.

In a detailed forty-four-page Decision and Order,[7] Supreme Court Justice Robert A. Sackett, clearly having reviewed the trial transcript and prior proceedings, and having considered over 1,600 pages of submissions, rejected all of Jimenez's claims. See Sackett -- § 440.10 Opinion at *1 n.2, *43-44.

Briefly stated, the court denied the actual innocence and insufficiency of the evidence claims on the merits. Id. at *12-15.[8] As for pre-indictment delay, the court noted that there is no statute of limitations for murder. Id. at *37-38. With respect to ineffective assistance of counsel, the court devoted eight pages

---

[7] This Decision and Order is included as an exhibit to Jimenez's second amended habeas petition, filed on April 24, 2019, before Judge Oetken. See Jimenez v. Graham, No. 11 Civ. 6468 at ECF No. 37-5, pgs. 1-44.

[8] The Appellate Division had previously rejected these claims in Jimenez's direct appeal in finding that the verdict was not against the weight of the evidence. See supra at 11-12.

of the opinion to a point-by-point review of Jimenez's arguments before ultimately rejecting the claim. Id. at *35-43.

As Justice Sackett addressed the same Brady issues that underlie Jimenez's instant § 1983 complaint, we will describe Justice Sackett's rulings in some detail. After a lengthy recitation of the requirements of Brady, see id. at *15-17, Justice Sackett addressed the defendant's specific Brady arguments, see id. at *17-34.

First, Justice Sackett discussed the failure of ADA Mattaway to disclose the transcripts of O'Brien's trial testimony against members of the Poison Clan gang in federal court in Virginia, see id. at *19-25, finding that the transcript information was "collateral to the defendant's case and provided solely additional impeachment material of the testifying witness." Id. at *22.

Next, Justice Sackett held that additional disclosure of the criminal conviction records of O'Brien and Morrissey would only have provided "additional impeachment fodder" but would not "have produced a different result in the verdict," id. at *12, or, stated in Brady parlance, additional disclosures of the witness's criminal records were not "material to the question of defendant's guilt," id. at *17-18. Justice Sackett noted that O'Brien's undisclosed crimes, namely, a 1992 conviction for Criminal

Possession of a Weapon, for which he received a sentence of three-and-a-half to seven years, and a 1989 conviction for brandishing a weapon, were similar to the disclosed crimes of violence and murder. Id. at *23. Justice Sackett also found that these non-disclosures were "inadvertent" and would not have "altered the outcome of the defendant's trial nor den[ied] him due process," as they "can hardly be considered [] highly material" to Jimenez's guilt. Id. at *24. Similarly, with respect to the potential Brady issues around Morrissey's undisclosed criminal history, Justice Sackett observed that the criminal history that was disclosed for Morrissey consisted of crimes of dishonesty, deceit and fraud, which were similar in nature to the undisclosed crimes. Id. at *26-28. Consequently, Justice Sackett found that "there was no 'reasonable probability' that disclosure of the additional criminal records of Andrew O'Brien and Kevin Morrissey would have changed the outcome of the defendant's trial." Id. at *27-28.

As for the argument that the prosecution failed to disclose the cooperation benefits that O'Brien and Morrissey would have received, Justice Sackett found:

> As the prosecutor clearly met her Brady obligation with regard to disclosure of the complete agreements made between her office and O'Brien and Morrissey for their testimony against the defendant, this Court finds no Brady violation under this issue.

Id. at *34.

In addition to Justice Sackett's rejection of all the Brady arguments, it is also significant that he found that the disclosure failures: "do[] not appear to be willful," id. at *18, and were "inadvertent" rather than "intentional," id. at *24.

ii. Jimenez's Appeal of the § 440.10 Motion

Jimenez appealed Justice Sackett's decision, and on July 21, 2016, a four-judge appellate panel (one judge concurring in result only) substantially affirmed Justice Sackett's opinion, remanding a single one potential Brady issue for a hearing. People v. Jimenez, 142 A.D.3d 149, 164, 37 N.Y.S.3d 225, 236 (1st Dept. 2016) ("Appeal of Sackett's § 440.10 Opinion").

The Appellate Division first reviewed Jimenez's actual innocence argument, which was based on "the statements of [Maxine Littlejohn and Dean Beckford] who claimed to have been in the movie theater on the night Worrell was killed but who did not testify," and who later told "an investigator hired by appellate counsel that the person . . . whose photograph they were shown [Jimenez], was not th[e] man" who shot Worrell. Id. at 142 A.D.3d at 153, 37 N.Y.S.3d at 229. In response, the First Department concluded: "Quite simply, this evidence [is] insufficient to warrant a hearing on actual innocence," because the purported exculpating statement

from Littlejohn was "patent hearsay," and the "Beckford statement [was] unsworn." Id. at 142 A.D.3d at 156, 37 N.Y.S.3d at 231. The court further noted that even if Littlejohn and Beckford's statements were admissible, there was nothing "inherently reliable about either," as they "were given many years after the shooting, contain[ed] a lack of detail tending to explain why their recollections can be considered accurate, and were made at the specific behest of an agent for defendant." Id. at 142 A.D.3d at 157, 37 N.Y.S.3d at 231. The Appellate Division's opinion also referenced Justice Sackett's finding that the proffered witness statements "did not 'deviate from the description provided by all of the eyewitnesses to the argument and the shooting: that the shooter spoke with a Jamaican accent and had brown skin.'" Id. at 142 A.D.3d at 154, 37 N.Y.S.3d at 229 (quoting Sackett -- § 440.10 at *14). Thus, the court concluded that these statements were insufficient to warrant a hearing and failed to "negate the competing evidence that a jury has already heard, weighed, and relied on to convict defendant." Appeal of Sackett's § 440.10 Opinion at 142 A.D.3d at 157, 37 N.Y.S.3d at 231.[9]

[9] In this regard, after proffers from the prosecutor about additional witnesses it could call, the Appellate Division observed that "for each new witness who defendant claims can unequivocally establish his innocence, there is another who can raise serious doubt about it, to say nothing of witnesses who actually testified at trial." Id. at 142 A.D.3d at 158, 37 N.Y.S.3d at 232.

Apart from Jimenez's reliance on these two statements, he also questioned the credibility of some trial witnesses. The court found this argument insufficient to "warrant a hearing on actual innocence," id. at 142 A.D.3d at 158, 37 N.Y.S.3d at 232, emphasizing:

> Many criminal trials feature witnesses whose credibility is challenged and procedures such as identification that are less than perfect. However, we give great deference to the jury's ability to resolve these issues. Were we to recognize a stand-alone actual innocence claim, a hearing would be warranted only where the proffered evidence, accepted as true, raised serious doubt about the defendant's guilt.

Id. The court found no basis for such "serious doubt."

The court then turned to the Brady issues. With respect to the non-disclosures related to Morrissey's criminal record, the court found that the disclosed information and Morrissey's own admissions sufficiently showed that he was a "con artist" and that his "untrustworthiness" was "evident and undisputed." Id. at 142 A.D.3d at 159, 37 N.Y.S.3d at 233. Thus, the additional information was "cumulative" and would not "have changed the outcome." Id. As for information about Morrissey's mental status, the court found that defense counsel had "independent access to the impeachment material." Id. at 142 A.D.3d at 160, 37 N.Y.S.3d at 233.

Focusing on O'Brien, the court found that disclosure of the transcripts from O'Brien's testimony during his federal trial in Virginia and of his additional convictions "would merely have been cumulative, and as such, cannot be considered material for purposes of finding a Brady violation." Id. at 142 A.D.3d at 161, 37 N.Y.S.3d at 234. Finally, we quote fully from the Appellate Division's decision with respect to an undisclosed report from O'Brien's proffer sessions with the FBI, which was central to Judge Oetken's Brady holding:

> Defendant also complains that he was not provided with an FBI report, prepared after O'Brien was interviewed by New York City and federal law enforcement personnel about the many crimes he was involved in and many of which he had knowledge. The report contains a highly detailed recounting of the facts surrounding many of those crimes. However, it has a mere three lines about Worrell's murder, stating only: 'O'Brien said this individual was killed in the Bronx, White Stone Movie Theatre, and his mother lived on 45th Street in Brooklyn.' Defendant contends that the report could reflect the fact that O'Brien was not forthcoming about the murder of Worrell because he knew far less about it than he let on at defendant's trial.
>
> We agree with the motion court that none of these materials, had they been available to the defense before the trial, had a reasonable possibility of changing the outcome. The FBI report that defendant asserts contained a suspiciously cursory description of Worrell's murder is not material. The report was primarily about O'Brien's involvement in gang activity and the people who traveled in the same orbit with him. At one point in the interview he was asked to identify photographs of approximately 40 of those people. One of them was Worrell, and O'Brien gave the same short

> description of him as he gave for each of the other people. There is no indication that it would have been appropriate, in the context of the interview, for O'Brien to describe Worrell's murder in detail or to offer that he had witnessed it.
>
> Defense counsel's cross-examination of O'Brien amply elicited the unsavory elements of his character, manifested by his racketeering conviction, which, by his own admission at trial, involved a conspiracy to distribute narcotics, a conspiracy perpetuated by murder where necessary. Further, the cross-examination revealed O'Brien's convictions, shortly before Worrell's murder, for weapons and drug possession. Any further impeachment material would merely have been cumulative, and as such, cannot be considered material for purposes of finding a Brady violation.

Id. at 142 A.D.3d at 160–61, 37 N.Y.S.3d at 233–34.

Furthermore, the court addressed Jimenez's contention that Justice Sackett had "failed to analyze his Brady claims on a collective basis." Id. at 142 A.D.3d at 161, 37 N.Y.S.3d at 234. While agreeing that was the appropriate standard, the Appellate Division concluded: "[W]e do not lack confidence that the trial's outcome would have been the same had the material, viewed collectively, been produced."[10] Id.

There was, however, one Brady issue that the court concluded required further exploration, which was whether the failure of the prosecution to disclose materials relating to O'Brien, namely, (i)

---

[10] The Appellate Division briefly addressed and rejected other Brady issues, which have played no role in this § 1983 case.

his plea agreement with federal prosecutors obligating him to cooperate; (ii) letters he sent to a federal judge seeking a sentence reduction; and (iii) an email from AUSA Novak to ADA Mattaway, was sufficient to require a hearing to determine whether ADA Mattaway knew that O'Brien was expecting a sentence reduction for his testimony in this case. Id. at 142 A.D.3d at 161-62, 37 N.Y.S.3d at 234-35. Determining that the existence of an undisclosed quid pro quo could have had a material impact on the jury, the Appellate Division remanded this singular issue for a hearing. Id. at 142 A.D.3d at 161-62, 164, 37 N.Y.S.3d at 234-36.

iii. Remanded Brady Issue

On remand, the trial judge held a hearing at which he heard testimony from ADA Mattaway, Det. Stradford, and O'Brien, and received the testimony of former AUSA David Novak by stipulation. In a Decision and Order dated June 29, 2018,[11] Justice Torres found that the three live witnesses testified credibly and that their testimony "clearly establishes that there was no quid pro quo

[11] This Decision and Order is included as an exhibit to Jimenez's second amended habeas petition, filed on April 24, 2019, before Judge Oetken. See Jimenez v. Graham, No. 11 Civ. 6468 at ECF No. 37-3, pgs. 1-4.

agreement." Torres, J. -- Remand at *3-4. Moreover, Justice Torres continued:

> I find no evidence of any agreement of any kind other than what the parties disclosed at trial and testified to before this Court at the hearing. There is no evidence before this Court to support the defendant's contention that there was any other agreement made between ADA Mattaway and Andrew O'Brien. I also find no evidence to support that there was any relationship between Det. Stradford and Mr. O'Brien or Det. Stradford and ADA Mattaway concerning any other agreement. Therefore, the Court finds there was no quid pro quo agreement between the Bronx prosecutor's office and Mr. O'Brien and/or the federal prosecutor. The Court further finds no Brady violation concerning the understanding between the Bronx prosecutor and Mr. O'Brien and/or the federal prosecutor.

Id. at *4.

Following Justice Torres's decision, Jimenez filed a motion for re-argument, which was denied.[12] People v. Jimenez, No. 3825/2006, at *4 (Sup. Ct. August 26, 2019) (Torres, J.). In denying re-argument, it is notable that Justice Torres reiterated his finding that AUSA Mattaway "testified credibly" and that throughout the trial, she had no knowledge of any agreement or arrangement between O'Brien and AUSA Novak. Id. at *3.

[12] This Decision and Order is included as an exhibit to Jimenez's second amended habeas petition, filed on December 5, 2019, before Judge Oetken. See Jimenez v. Graham, No. 11 Civ. 6468 at ECF No. 56-1.

Leave to appeal the denial of re-argument to the Appellate Division was denied, see People v. Jimenez, 2018 N.Y. Slip. Op. 87587(U) (1st Dep't 2018), as was leave to appeal to the New York Court of Appeals, see People v. Jimenez, 2019 N.Y. Slip Op. 66214(U) (1st Dep't 2019).

**4. Jimenez's Habeas Corpus Petition**

On September 9, 2011, Jimenez filed a petition for a writ of habeas corpus in federal court, which was stayed by Judge Oetken of this Court pending the outcome of Jimenez's state post-conviction proceedings. Jimenez v. Graham, No. 11 Civ. 6468 (JPO), 2011 WL 6287999, at *6 (S.D.N.Y. Dec. 14, 2011). Following the lifting of the stay, Judge Oetken granted Jimenez's petition on Brady grounds without addressing the other issues Jimenez raised about his prosecution and conviction. See Oetken Opinion -- Habeas at *13. Judge Oetken's opinion is lengthy, but his Brady findings are limited to the non-disclosures related to O'Brien.

To begin, Judge Oetken held that he could not "conclude that it was objectively unreasonable for the hearing court [Justice Torres on remand] to determine that there was no quid pro quo agreement in place." Id. at *6. However, Judge Oetken rejected the hearing court's second holding that there was "'no Brady violation concerning the understanding between the Bronx

prosecutor and Mr. O'Brien,'" finding that it "was an unreasonable application of Brady." Id. (internal citation omitted). Specifically, Judge Oetken found that the disclosure that O'Brien was "currently jailed in Federal Custody for Murder (unrelated) and serving 30 years," and that he had "asked for a letter to be prepared by the undersigned [ADA Mattaway] that he can put in his file stating that he testified for the Bronx District Attorney's Office," was insufficient for Brady purposes. Id. at *7. This finding was based on the "prosecution's failure to disclose everything it knew about O'Brien's potential use of the letter, including the fact that he had cooperated in a federal case, had received a Rule 35 order reducing his sentence, had continued to seek a sentence reduction, and that the letter would be sent to the AUSA who had previously filed a Rule 35 motion on his behalf." Id.

Judge Oetken further determined that the failure to produce to the defense a 1997 FBI report that recorded a lengthy interview with O'Brien constituted a second Brady violation. See id. at *9-11. This finding specifically rejected the unanimous holding of the Appellate Division, quoted supra at 18-21, which found the non-disclosure "not material" in the context of Brady.

In light of these Brady findings, Judge Oetken ordered Jimenez to be released unless he was provided a new trial within 120 days. Id. at *13; see also SAC ¶ 38. On April 10, 2023, the Bronx DA's Office opted to dismiss the indictment and not retry Jimenez, who had already served about fifteen years of his twenty-two years to life sentence for the Worrell murder, which, at that point, had occurred nearly thirty-five years earlier. SAC ¶¶ 39-40. In the wake of this successful habeas petition, Jimenez filed the Section 1983 action currently before us.[13]

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true the complaint's factual allegations, as well as those facts incorporated by reference into the complaint, and draw all reasonable inferences in the plaintiff's favor. Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007); see also Johnson v. JPMorgan Chase Bank, N.A., 488 F. Supp. 3d 144, 161 n.29 (S.D.N.Y. 2020) ("In deciding a motion to dismiss, the Court can consider documents incorporated by reference in the

[13] Jimenez filed this action on August 2, 2023. See ECF No. 1. Defendants sought leave to dismiss on December 8, 2023, see ECF No. 28, but before any motion could be made, Jimenez filed a first Amended Complaint on January 10, 2024, see ECF No. 32, and a Second Amended Complaint on January 22, 2024, see ECF No. 35. On March 1, 2024, defendants moved to dismiss the Second Amended Complaint. See ECF No. 45. That motion was fully briefed on April 19, 2024. See ECF Nos. 46, 49, 51.

complaint.”). Those “[f]actual allegations must be enough to raise a right of relief above the speculative level.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). “Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.” Papasan v. Allain, 478 U.S. 265, 286 (1986). Ultimately, unless a plaintiff alleges “enough facts to state a claim to relief that is plausible on its face,” the “complaint must be dismissed.” Twombly, 550 U.S. at 570.

## DISCUSSION

The ensuing discussion addresses, on a defendant-by-defendant basis, Jimenez’s claims of malicious prosecution, denial of fair trial rights, and failure to intervene, followed by the issues of municipal liability under § 1983 and Monell v. Dep’t of Social Services, 436 U.S. 658 (1978), and common law negligence.

### A. Detectives Serrano and Horn

Jimenez brings three claims against Dets. Serrano and Horn, the detectives initially assigned to the Worrell murder but whose investigation concluded without any charges being brought. Jimenez’s claims against these detectives include malicious

prosecution, see SAC ¶¶ 123-34, denial of fair trial rights, see id. ¶¶ 135-46, and a failure to intervene, see id. ¶¶ 147-56. As explained below, these claims fail for two key reasons: (1) first, Jimenez is unable to link the issues he perceives in Dets. Serrano and Horn's 1989 investigation to the legal proceeding brought against him nearly two decades later; and (2) second, there are no particularized facts to support Jimenez's claims, which, as pled, are, in essence, mere recitations of the elements of the causes of action. We address each claim in turn.

**1. Malicious Prosecution**

To state a claim for malicious prosecution under § 1983, a plaintiff must "show a violation of his rights under the Fourth Amendment . . . and [then] establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010).[14] In New York, these elements include: "1) the initiation or continuation of a criminal proceeding against plaintiff; 2) termination of the proceeding in plaintiff's favor; 3) the lack of probable cause for commencing the proceeding; and 4) actual malice as a motivation for defendant's actions." Id. To succeed on such a claim, a plaintiff

[14] Jimenez also brings a malicious prosecution claim under New York law, but since the § 1983 standard embodies the requisite state standard, we need not analyze his state claim separately. See id.

must clear "a high bar," Frederick v. New York City, No. 11 Civ. 469 (JPO), 2012 WL 4947806, at *9 (S.D.N.Y. Oct. 11, 2012), when, as here, he bears the "burden of rebutting the presumption of probable cause" that attaches upon a grand jury indictment, Rothstein v. Carriere, 373 F.3d 275, 284 (2d Cir. 2004). To satisfy this burden, a plaintiff must present evidence of grand jury misconduct or "fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith," id., that erodes the "premise that the Grand Jury acts judicially," Colon v. City of New York, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248, 1250 (1983). Even if a plaintiff meets this burden, he must still establish that the prosecution was brought with malicious intent, which equates to "'a wrong or improper motive, something other than a desire to see the ends of justice served.'" Watson v. Cieslak, 09 Civ. 2073 (DAB)(JCF), 2011 WL 446276, *8 (S.D.N.Y. Jan. 5, 2011) (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 445 (1978).

Jimenez's claim fails at the outset, as the actions of Dets. Serrano and Horn -- whose investigation stopped seventeen years before Jimenez was indicted for Worrell's murder -- indisputably did not lead to "the initiation or continuation of a criminal proceeding" against Jimenez. Manganiello, 612 F.3d at 161.

Indeed, the opposite is the case: in 1989, after Blaylock failed to appear for a lineup to identify Jimenez as the shooter -- due to fear over losing his job and endangering his family, see supra at 6 -- Jimenez was released from police detention, see SAC ¶ 62. No criminal process ensued, and the case went cold for over a decade. Id. ¶¶ 63-64.

By the time the case was revived around 2000, Det. Stradford, not Dets. Horn or Serrano, who had "retired by the time of trial," see Appeal of Sackett's § 440.10 Opinion at A.D.3d at 152, 37 N.Y.S.3d at 228, had "assumed responsibility for the Worrell case," SAC ¶ 64. And, based on the record, it does not appear that either Det. Serrano[15] or Horn was involved in this second investigation. Thus, the actions of Dets. Serrano and Horn in 1989 lack the necessary throughline to Jimenez's 2006 prosecution, and as such, neither detective can be liable for malicious prosecution.

While the absence of such a causal link is sufficient to dismiss the malicious prosecution claim against Dets. Serrano and Horn, Jimenez's malicious prosecution claim fails for two other independent reasons. First, as will be discussed further, Jimenez has not rebutted -- as it is his burden to do -- the strong

[15] Det. Serrano testified at trial, but his testimony was limited to the investigation in 1989. See Appeal of Sackett's § 440.10 Opinion, 142 A.D.3d at 153, 37 N.Y.S.3d at 228.

presumption of probable cause which follows from a grand jury indictment. Rothstein, 373 F.3d at 284. Second, while the complaint's references to Dets. Serrano and Horn's alleged fabrication, actual malice, etc. are dramatic, SAC ¶¶ 123-34, these serious allegations are advanced without support in the record. The deference to a complaint on a motion to dismiss only applies to supportable factual allegations, not bald legal assertions. Iqbal, 556 U.S. at 678.

One example of the lack of support for Jimenez's bald allegations is the assertion that "[a]fter a highly suggestive 'single photo' identification procedure, Blaylock purportedly identified Jimenez as the shooter." SAC ¶ 57. While a review of the DD-5s calls into serious question whether Blaylock was shown only a single photo for identification purposes, such a claim, even if true, would fail as a matter of law because a single photo identification is not unlawful when there is an independent basis for the identification. See, e.g., Layton v. Phillips, 340 F. App'x 687, 689 (2d Cir. 2009) (highlighting that single photographic identification procedures are appropriate so long as they are not "'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'") (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). That

independent basis may derive from the witness's past relationship with the defendant or from the witness's observation of the crime.[16] See, e.g., Manson v. Brathwaite, 432 U.S. 98, 116 (1977) (finding that a "single-photograph display[]," when administered to an eyewitness without "coercive pressure," was permissible, as it did not create "a very substantial likelihood of irreparable misidentification") (internal marks and citation omitted); United States v. Jimenez, No. 20 Crim. 122 (LTS), 2020 WL 7231062, at *2 (S.D.N.Y. Dec. 8, 2020) ("[C]ourts in this circuit have held that identification procedures consisting of the display of a single photograph to a witness who states that the witness already knows the perpetrator, in order to confirm the perpetrator's identity, are not unduly suggestive."); United States v. Hardy, No. 10 Cr. 1123 (JSR), 2011 WL 7782582 (S.D.N.Y. Jan. 25, 2011) (finding that the Government's display of "a confirmatory photograph of a person the witness has indicated that he already knows" was "perfectly acceptable" and not "unduly suggestive"). Here, Blaylock stated from the outset that he had known Jimenez for "about 2 years," see DD-5 at R-000085, and that he directly witnessed the crime, SAC ¶

[16] It is also worth highlighting that under New York law, a "confirmatory identification" from a single photograph does not implicate due process concerns. People v. Rodriguez, 79 N.Y.2d 445, 593 N.E.2d 268 (1992). Indeed, the single photograph method can be "confidently applied where," as here, "the protagonists are . . . friends or acquaintances." Id. at 79 N.Y.2d at 450, 593 N.E.2d at 272.

52.[17] Either of these facts would be sufficient to rebut any claim of an impermissibly suggestive, single-photo identification of Jimenez, and by extension, any claim of malicious prosecution.

**2. Fair Trial Claim**

Jimenez also asserts a fair trial claim against Dets. Serrano and Horn predicated on an unsubstantiated fabrication of evidence allegation concerning Blaylock's identification. Id. ¶¶ 135-46. To prevail on such a claim, a plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) of a material nature that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir. 2016). Jimenez's allegations, no doubt deliberately, leave out the fact that seventeen years after the initial interviews by Dets. Serrano and Horn, Blaylock testified under oath before the grand jury and identified Jimenez as the shooter. See G.J. Min. at 18:5-7, 22:19-21 ("I have seen him around the neighborhood and . . . I didn't know him personally[,] but I knew of him. I knew of him as Leon. . . . I recognized his face. I have one [sic] question about

[17] Moreover, Blaylock notably did not withdraw his identification of Jimenez while under oath before the grand jury and at trial. See infra at 32-33.

it. I am a good judge, I recognized him instantly. I said this is the guy.”). Again under oath, Blaylock testified at trial, where he was also cross-examined by defense counsel who could utilize the DD-5's to challenge Blaylock's initial statements to Dets. Serrano and Horn. See Sackett -- § 440.10 Opinion at *41. Significantly, Jimenez does not allege -- nor could he -- that Blaylock ever recanted his identification of Jimenez or his sworn testimony before the grand jury or at trial.[18]

As with the malicious prosecution claim, there is no throughline between Dets. Serrano and Horn's investigative work and the eventual prosecution of Jimenez seventeen years later. It is undisputed that Dets. Serrano and Horn's investigation of Worrell's murder ended (i) without any charges being brought against Jimenez or anyone else,[19] and (ii) without any evidence in

[18] In Jimenez's efforts to undermine the series of consistent identifications made by Blaylock over many years, Jimenez attached to his complaint an affidavit, dated April 23, 2012, from a "private investigator" hired on Jimenez's behalf. See SAC, Ex. E. Even apart from the fact that this affidavit clearly constitutes inadmissible hearsay, it notably does not contain a recantation of Blaylock's identification. Moreover, while this Court has no independent capacity to learn what documents were presented to Justice Sackett, this affidavit, bearing the date of April 23, 2012, was available to file in connection with Jimenez's § 440.10 motion and yet it is not mentioned in either Justice Sackett's decision or in the appeal therefrom. Sackett -- § 440.10 Opinion at *1-44; Appeal of Sackett's § 440.10 Opinion, 142 A.D.3d at 149-64, 164, 37 N.Y.S.3d at 225-36; see also infra at 43 n.24.

[19] Given that no prosecution resulted during the time that Dets. Serrano and Horn were assigned to the investigation, there is no basis for an assertion of a Brady claim against the detectives, assuming that the Second Amended Complaint tries to assert one.

the record indicating that Dets. Serrano or Horn had any communication with the Bronx DA's Office about initiating a prosecution years later. In short, these basic elements of a fair trial claim have not been met, and the claim must therefore be dismissed.

Even assuming, arguendo, that Dets. Serrano and Horn's investigation had resulted in a criminal proceeding against Jimenez, his fabrication-based fair trial claim would still fail. In general, fabrication-based fair trial claims under § 1983 address situations in which "a government official manufactures false evidence against an accused, and the use of that fabricated evidence results in the deprivation of the accused's liberty." Bailey v. City of New York, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015). "[M]anufactured" evidence is typically planted evidence, forced testimony, or falsified police reports. See e.g., Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 126 (2d Cir. 1997) (involving allegations that an officer invented a suspect's written confession); Barnes v. City of New York, 68 F.4th 123, 129 (2d Cir. 2023) (involving officers lying to prosecutors in relaying that they witnessed the defendant sell drugs); Shabazz v. Kailer, 201 F. Supp. 3d 386, 391 (S.D.N.Y. 2016) (involving officers who allegedly fabricated photographs linking suspect to a handgun).

In this case, Jimenez does not advance any wrongdoing consistent with the type of facts covered by a fabrication-based fair trial claim. Rather, Jimenez largely distorts Dets. Serrano and Horn's standard investigative procedures, characterizing them as fabrication. Further, it is noteworthy that Blaylock is not the object or subject of any Brady claim addressed by either Justice Sackett's opinion on Jimenez's § 440.10 petition in state court or Judge Oetken's habeas opinion in this Court. See supra at 12-16, 23-25. At bottom, Jimenez offers no proof that evidence against him was manufactured, nor are there any particularized facts suggesting that Dets. Serrano or Horn planted, mishandled, or otherwise invented evidence implicating Jimenez. For these reasons, Jimenez's fair trial claim must be dismissed.

### 3. Failure to Intervene

Jimenez's third claim against Dets. Serrano and Horn is a vague, scattered failure to intervene claim. SAC ¶¶ 147-56. On a failure to intervene claim, an "officer can be held liable under Section 1983 for 'the preventable harm caused by the actions of the other officers if that officer observes or has reason to know that (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official.'" Kayo v. Mertz, 19

Civ. 365 (PAE), 2021 WL 1226869, at *16 (S.D.N.Y. 2021) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). Specifically, with respect to the third element, "'[a] police officer cannot be held liable for failure to intervene unless such a failure permitted fellow officers to 'violate a suspect's clearly established statutory or constitutional rights' and was under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." Jackson v. Tellado, 236 F. Supp. 3d 636, 655 (E.D.N.Y. 2017) (quoting Morris v. City of New York, No. 14 Civ. 1749 (JG) (LB), 2015 WL 1914906, at *6 (E.D.N.Y. Apr. 27, 2015)).

Significantly, only those who are the direct objects of a failed intervention have standing to bring such a claim. See Martinez v. City of New York, 564 F. Supp. 3d 88, 106 (E.D.N.Y. 2021) ("[A] plaintiff must demonstrate that the officer's failure to intervene 'permitted fellow officers to violate' the plaintiff's 'clearly established statutory or constitutional rights,'") (quoting Ricciuti, 124 F.3d at 129) (emphasis added). According to the arguments presented, the only individuals with whom Dets. Serrano and Horn are alleged to have interacted in this context are Blaylock and Ramroop, yet there is no claim of excessive force, wrongful arrest, or other constitutional right

impairment as to either of them. Moreover, to the extent Jimenez attempts to assert a derivative failure to intervene claim based on a "coercive interrogation" as to Ramroop, it would fail for the additional reason that Ramroop's responses to the detectives' questioning played no role in Jimenez's indictment or trial, as Ramroop, who was not an eyewitness, never testified.[20] Sackett -- § 440.10 Opinion at *39. And, as noted earlier, see supra at 32–33, Blaylock swore before the grand jury and at trial to his positive identification of Jimenez, an identification he has never recanted in over thirty-five years.

It is also telling that none of the appellate reviews of Jimenez's prosecution contain any suggestion that Dets. Serrano or Horn engaged in any unconstitutional practice, let alone failed to intervene in any such situation. See supra at 10–25. Thus, since "there is no underlying constitutional violation," Jimenez "cannot succeed on a claim for failure to intervene under § 1983." Kayo, 2021 WL 1226869, at *16.

To summarize, Jimenez's claims against Dets. Serrano and Horn fail for numerous, independent reasons, including, but not limited to, (i) a lack of a causal throughline, (ii) a failure to rebut

---

[20] For completeness, we note that there is no suggestion in the record that Det. Stradford ever had any interaction with Ramroop.

the probable cause presumption from the grand jury's indictment, and (iii) an absence of specific factual predicates for the asserted claims. We thus dismiss Jimenez's claims against Dets. Serrano and Horn with prejudice.

**B. Jimenez's Claims as to Detective Stradford**

Jimenez also asserts the same three § 1983 claims against Det. Stradford: malicious prosecution, see SAC ¶¶ 123-34, denial of fair trial rights, see id. ¶¶ 135-46, and failure to intervene, see id. ¶¶ 147-56. Again, we address each in turn.

**1. Malicious Prosecution[21]**

As discussed above, a malicious prosecution claim has four elements, see supra at 27, one of which requires a plaintiff to overcome the presumption of probable cause that attaches upon a grand jury indictment. See Rothstein, 373 F.3d at 284. To defeat that presumption, there must be evidence of grand jury impropriety or "fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith." Id. As highlighted earlier, rebutting the probable cause presumption is a "high bar" to clear, Frederick, 2012 WL 4947806, at *27, as it requires "a finding of

[21] As discussed earlier, see supra at 27 n.14, we recognize that Jimenez asserts malicious prosecution claims under both § 1983 and state law, but since a § 1983 malicious prosecution claim's elements encompass the elements of a state law malicious prosecution claim, we do not discuss them as separate causes of action.

[grand jury] misconduct sufficient to erode the 'premise that the [g]rand [j]ury acts judicially [,]'" Rothstein, 373 F.3d at 284 (quoting Colon, 468 N.Y.S.2d at 455, 455 N.E.2d at 1248).

Jimenez fails to clear this "high bar," for the record is devoid of evidence showing any defect in the grand jury proceedings. Indeed, the only allegation about the grand jury proceeding is a general claim that "SERRANO, HORN and/or STRADFORD falsely testified concerning their alleged interactions with Blaylock and/or O'Brien, including, but not limited to, before the Grand Jury and/or at trial." SAC ¶ 114.

Since Jimenez's Second Amended Complaint facially lacked specific allegations of grand jury irregularity, we asked the parties to furnish the Court with the available grand jury minutes to provide greater assurance for our analysis. In response, the parties shared with the Court the grand jury testimony of Det. Stradford, along with that of eyewitness Blaylock.[22]

The transcript of Det. Stradford's grand jury testimony fails to offer any support for the allegation that Det. Stradford falsely testified before the grand jury. Det. Stradford's grand jury

[22] Counsel from both sides represented to this Court in an email from November 13, 2024, that the grand jury minutes made available to the Court reflect "the only grand jury testimony from Det. Stradford." Similarly, Blaylock's testimony appears complete.

testimony was entirely unremarkable, and Jimenez has not suggested otherwise since the Court requested the transcript. Det. Stradford's testimony can be summarized as follows: at the outset, after being sworn in, he shared his general biographical information, including his rank, shield number, and experience as a cold case detective. See G.J. Min. at 2:6-3:1. Det. Stradford then explained his role in investigating the Worrell murder. He stated that he was assigned the case in December of 1999, and his seven-year investigation culminated when he arrested Jimenez on August 31, 2006. Id. at 3:1-23. Det. Stradford also acknowledged that he met with Blaylock to conduct "an identification procedure," during which Blaylock recognized Jimenez as the one who shot and killed Worrell. Id. at 3:24-4:15. This is the sum total of Det. Stradford's grand jury testimony.[23]

[23] As for Dets. Serrano and Horn, Jimenez's counsel urges us not to accept the Corporation Counsel's representation that neither testified before the grand jury. See ECF No. 49 ("Pl.'s Opp.") at 15 n.2. Apart from counsel's obligation to be candid with the Court, see ABA Code of Professional Responsibility, Rule 3.3, Candor Toward the Tribunal, there is no reason to doubt the Corporation Counsel's representation. First, given that Det. Stradford and Blaylock testified before the grand jury, there was no need for the District Attorney's Office to have called Dets. Serrano or Horn. Second, the Appellate Division's opinion on Jimenez's § 440.10 petition notes that Det. Serrano identified the DD-5 in connection with his interview of one of the eyewitnesses. See Appeal of Sackett's § 440.10 Opinion, 142 A.D.3d at 153, 37 N.Y.S.3d at 228. Given that Det. Serrano testified at trial, his prior statements would have been produced to the defendant in the normal course of trial. Thus, had Det. Serrano testified before the grand jury, Jimenez would have that testimony, which he apparently does not. Further, there is no indication that Det. Horn testified at trial or otherwise.

Additionally, insofar as Jimenez's malicious prosecution claim is based on an allegation that the grand jury presentation did not reveal all known evidence against Jimenez, such a claim fails as a matter of established law. "[A] prosecutor is not required to present to the grand jury exculpatory evidence." Horton v. Ercole, 557 F. Supp. 2d 308, 330–31 (N.D.N.Y. 2008); see also United States v. Williams, 504 U.S. 36, 51–52 ("[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body. . . . Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with th[e] [traditional] system."). Therefore, even if Jimenez could show that some exculpatory evidence was not presented before the grand jury, his claim would still fail.

To conclude, Jimenez has not rebutted the presumption of probable cause that attaches to a grand jury indictment, as there is no evidence to "warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially[.]" Rothstein, 373 F.3d at 284 (internal marks and citation omitted).

**2. Fair Trial Claim**

Jimenez also asserts a fair trial claim against Det. Stradford. As with his fair trial claims against Dets. Serrano and Horn, Jimenez brings a fabrication of evidence-based claim. First, Jimenez alleges that Det. Stradford coerced or induced Blaylock to "agree to testify against Jimenez" and should have known that Blaylock's identification of Jimenez was untrue. SAC ¶¶ 65-66, 137-39. However, there are no well-pled facts to support these serious allegations. See Iqbal, 556 U.S. at 678.

Moreover, with respect to Blaylock, Jimenez conveniently fails to highlight that Blaylock identified Jimenez as the shooter at least twelve years before Det. Stradford had any involvement in the Worrell homicide investigation. See DD-5 at R-000085. Nor does Jimenez's complaint reference that Blaylock identified Jimenez as the shooter in sworn testimony before the grand jury and at trial, where he was cross-examined. Furthermore, Jimenez overlooks the fact that Blaylock did not retract his identification of Jimenez, even during a telephone interview six years after the

trial with a private investigator hired by the Office of the Appellate Defender.[24]

Next, Jimenez suggests, without evidence or specifics, that Det. Stradford knew or should have known that Blaylock's identification of Jimenez was untrue. Such a bald allegation is totally insufficient as a matter of law. Issues of witness credibility, absent a few exceptions, are for the jury to decide. United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury.").

Finally, the absence of any factual support for the allegation that Det. Stradford knew or should have known that Blaylock and/or O'Brien's identification testimony was false segues well into the equally unsupported allegation that Det. Stradford "failed to produce to the District Attorney's Office exculpatory information that would have materially benefitted the defense, thereby

---

[24] This telephone interview is, of course, inadmissible hearsay, and it was notably not relied upon by Jimenez in his § 440.10 motion. See supra at 12-23. During Blaylock's discussion with the defense's private investigator, he described Det. Stradford's identification procedure as a "Where's Waldo" type situation in which Jimenez's photograph appeared in multiple arrays. SAC, Ex. E at ¶ 3. However, as noted above, see supra at 33 n.18, although the OAD had the affidavit from the private investigator, whom they hired, during the pendency of Jimenez's § 440.10 motion before the New York State Supreme Court, there is no mention of it in the lengthy opinion by Justice Sackett or in the § 440.10 appeal. A reasonable conclusion is that it was either not filed or was not the focus of Jimenez's motion.

bringing about violations of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150, 154 (1972)." SAC ¶ 140. A careful review of Judge Oetken's habeas opinion establishes that there is no reference to Dets. Serrano, Horn, or Stradford as having involvement in, or responsibility for, any possible Brady violations. See Oetken Opinion -- Habeas at *1-13; see also supra at 23-25.

In addition, Jimenez contends that his fair trial rights were denied as a result of Det. Stradford's interactions with O'Brien. Jimenez broadly claims that "O'Brien falsely inculpated Jimenez due to inducement and/or other and further suggestive and/or otherwise improper conduct by STRADFORD," SAC ¶ 75, and that Stradford "knew and/or should have known" that O'Brien had falsely implicated Jimenez, id. ¶ 76. Jimenez does not offer any specific indication as to how Det. Stradford's investigative practices were suggestive or provided any inducement to O'Brien.[25] There is no basis to conclude that Det. Stradford coerced an identification or a statement from O'Brien, nor is there a suggestion that Det. Stradford showed O'Brien fabricated evidence to compel him to

[25] In fact, Justice Torres, after having heard from Det. Stradford in a hearing, made the following factual finding: "I find no evidence of any agreement of any kind other than what the parties disclosed at trial and testified to before this Court at the hearing." Torres, J. -- Remand at *4.

implicate Jimenez. See Sackett -- § 440.10 Opinion at *8-10. Indeed, Jimenez's position is that O'Brien, facing a lengthy federal sentence, needed no inducement from Det. Stradford to testify falsely or otherwise. Jimenez's effort to recast Det. Stradford as a juror responsible for evaluating the truth of O'Brien's testimony based on O'Brien's motivation to fabricate is simply misplaced.

**3. Failure to Intervene**

The third cause of action in the Second Amended Complaint is styled as a broad allegation that "SERRANO, HORN, and STRADFORD failed to intervene to prevent, end, or report the unconstitutional conduct to which Jimenez was subjected, despite the fact that they had opportunities to do so[,] [and] [h]ad any of them come forward, it would have prevented Jimenez from being wrongfully convicted." SAC ¶¶ 148-49. We have already addressed and dismissed this cause of action with respect to Dets. Serrano and Horn. See supra at 35-38. Turning now to Det. Stradford, an examination of the pleading reveals the absence of any factual allegation that would support a failure to intervene claim against him. Indeed, the only references to Det. Stradford are in the recitals of the elements of the cause of action. See e.g., SAC ¶¶ 148, 151-53. Clearly, those recitals, without supportive facts, are

insufficient to state a claim. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Brown v. Daikin Am. Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678). Moreover, Jimenez has apparently, and appropriately, reached the same conclusion, as his answering memorandum on the pending motion only references Dets. Serrano and Horn on the failure to intervene claim.[26]

Finally, it is fundamental that there must be at least two actors to create a potential failure to intervene claim,[27] and since Det. Stradford, according to the complaint, conducted his

[26] Indeed, Jimenez has -- by failing to discuss the failure to intervene claim against Det. Stradford in his opposition brief -- effectively abandoned his intervention claim against Det. Stradford. Courts in this Circuit often dismiss "a plaintiff's claims when the plaintiff did not discuss them in his opposition to the defendant's motion to dismiss." Farag v. XYZ Two Way Radio Serv., Inc., No. 22 Civ. 1795, 2023 WL 2770219, at *2 (2d Cir. Apr. 4, 2023) (citing Gross v. Rell, 585 F.3d 72, 94 (2d Cir. 2009)). Thus, where a party either only partially opposes a relevant issue or fails to engage with or defend the issue entirely, that issue is considered to "'have been abandoned.'" Farag, 2023 WL 2770219, at *2 (quoting Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014).

[27] Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997) ("A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal marks omitted); Jackson v. City of New York, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) ("An officer may be held liable [on a failure to intervene claim] for preventable harm caused by the actions of other officers.").

investigation alone, see SAC ¶¶ 64-77, there was never a basis for a failure to intervene claim against him.

**C. Jimenez's Municipal Liability Claims under § 1983 and Monell**

Jimenez also asserts claims under § 1983 and Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), against the Bronx County District Attorney's Office and the City of New York. Jimenez's claim against the Bronx DA is dismissed, as that office is not a suable entity.[28] We now turn to Jimenez's Monell[29] claim against the City of New York.

A municipality may not be held liable for unconstitutional conduct under § 1983 on the basis of respondeat superior. Monell, 436 U.S. at 693-95. Thus, a plaintiff must establish that the municipality itself was directly at fault, Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), by linking a predicate "constitutional tort," some "purposeful or knowing conduct," or "deliberate

[28] The "Eleventh Amendment prohibits individuals from suing the District Attorney's Office, an arm of the state, for damages under 42 U.S.C. § 1983 arising from prosecutorial decisions." Quiles v. City of New York, No. 01 Civ. 10934 (LTS) (THK), 2002 WL 31886117, at *2 (S.D.N.Y. Dec. 27, 2002). And, as the Supreme Court has held, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." Employees v. Missouri Public Health & Welfare Dep't, 411 U.S. 280, 280 (1973).

[29] The elements of a Monell claim are well-established. "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).

indifference," Farmer v. Brennan, 511 U.S. 825, 835-41 (1994) (internal citations omitted), to a specific "action pursuant to official municipal policy," Monell, 436 U.S. at 691. This analytical structure often drives courts in this Circuit to "bifurcate or stay discovery on Monell claims until after the plaintiff established that an individual defendant violated the plaintiff's constitutional rights." Lopez v. City of New York, No. 20 Civ. 2502 (LJL), 2021 WL 2739058, at *2 (S.D.N.Y. July 1, 2021); see e.g., Ricciuti v. New York City Transit Auth., 796 F. Supp. 84, 88 (S.D.N.Y. 1992) (granting motion to bifurcate discovery in a Monell action).

Here, Jimenez's municipal liability claim is predicated on purported systematic Brady violations in the Bronx DA's Office, which, by extension, are attributed to New York City.[30] Jimenez's claim fails because the presence of a Brady violation, without a further showing of intent, is an insufficient "constitutional tort" for Monell purposes. When bringing a § 1983 Brady claim, a plaintiff must not only show that police or prosecutors withheld material exculpatory evidence, but that such evidence was

[30] Jimenez asserts that the underlying constitutional tort is ADA Mattaway's failure to turn over material that Judge Oetken found constituted Brady. See Oetken Opinion -- Habeas at *3-13. To be clear, our analysis at this stage proceeds with Judge Oetken's opinion as a given.

willfully or intentionally withheld. Bellamy v. City of New York, 914 F.3d 727, 751 n.23 (2d Cir. 2019) ("[A] civil Brady claim requires a showing that the non-disclosure was intentional."); see also Fappiano v. City of N.Y., 640 F. App'x 115, 118 (2d Cir. 2016) ("We have never held that anything less than an intentional Brady violation establishes a § 1983 due process claim for damages."). Here, the record establishes that the ADA's actions lacked the required intentionality. Indeed, the record is to the contrary. See supra at 14-16, 18-22.

To begin, of the four Brady claims reviewed by the Appellate Division, three were wholly rejected. See supra at 18-21. And while the fourth (i.e., the non-disclosure regarding O'Brien's desired sentence reduction) was deemed sufficient to warrant a hearing before the trial court, the Appellate Division noted that there was nothing in the record to "establish[] that the Bronx prosecutor knew there was a quid pro quo in place for O'Brien's testimony." Appeal of Sackett's § 440.10 Opinion at 142 A.D.3d at 162, 37 N.Y.S.3d at 235. Moreover, on the remanded Brady issue, the trial judge, after a hearing, found that there was no such Brady violation, that both ADA Mattaway and O'Brien credibly testified that there was no quid pro quo, and that the disclosures at trial were complete. Torres, J. -- Remand at *3-4.

Furthermore, while Judge Oetken, contrary to the state courts, found a Brady violation, he never indicated that any non-disclosure attributable to ADA Mattaway was willful or malevolent. See Oetken Opinion -- Habeas at *3-13; see also supra at 23-25. And more broadly, Justice Sackett, beyond rejecting all the Brady arguments, found that any disclosure failures "do[] not appear to be willful," Sackett -- § 440.10 Opinion at *18, and were "inadvertent" rather than "intentional," id. at *24.

In sum, four justices of the Appellate Division, Justice Sackett on Jimenez's § 440.10 motion, and Justice Torres on the one remanded issue found no Brady violations. Judge Oetken reached the opposite conclusion. However, the issue before this Court is not which judge or judges were correct in their view of the law. Rather, a sufficient takeaway for our purposes is that reasonable jurists disagreed about whether there was a Brady violation, and that lack of consensus clearly demonstrates that any alleged Brady violation was not so glaringly intentional or flagrant as would be required to satisfy the civil Brady standard. Moreover, as noted, both Justices Sackett and Torres found that any non-disclosure was not willful or intentional. Jimenez's Monell claim thus fails and is dismissed.

**4. Common Law Negligence**

Finally, Jimenez asserts that the City is liable under a common law negligence theory for hiring and retaining the defendant detectives. While we could decline to exercise supplemental jurisdiction over this state claim, Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."), given the age of the case and the baselessness of Jimenez's claim, we address it on the merits.

Any negligent hiring theory presumes that a "predicate tort" has indeed occurred. Zeak v. United States, No. 11 Civ. 4253 (KPF), 2015 WL 246340, at *3 (S.D.N.Y. Jan. 20, 2015) ("Lacking a predicate tort, Plaintiff cannot proceed with the derivative claim of negligent hiring and retention."). Here, since we have not, after close consideration, found any constitutional violations by any individual defendant, we conclude that Jimenez lacks the basic, necessary predicate to sustain his negligent hiring claim. Accordingly, it is dismissed on the merits.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion and dismisses Jimenez's Second Amended Complaint in its entirety and with prejudice. The Clerk of Court is respectfully requested to terminate the motion pending at ECF No. 45 and close the case.

**SO ORDERED.**

Dated: March 27, 2025
New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE